1

2

3

4

**FILED**
CLERK, U.S. DISTRICT COURT

7/25/2024

CENTRAL DISTRICT OF CALIFORNIA
BY: ___CDO___ DEPUTY

5

6

7

8               UNITED STATES DISTRICT COURT

9           FOR THE CENTRAL DISTRICT OF CALIFORNIA

10                  January 2024 Grand Jury

11  UNITED STATES OF AMERICA,        CR No.  2:24-cr-00456-TJH

12           Plaintiff,              I N D I C T M E N T

13           v.                      [18 U.S.C. § 1348(1): Securities
                                     Fraud; 15 U.S.C. §§ 78j(b), 78ff
14  ANDREW LEFT,                     and 17 C.F.R. § 240.10b-5: Fraud
                                     in Connection with Purchase and
15           Defendant.              Sale of Securities; 18 U.S.C.
                                     § 1001(a)(2): Making False
16                                   Statements; 18 U.S.C.
                                     § 981(a)(1)(C) and 28 U.S.C.
17                                   § 2461(c): Criminal Forfeiture]

18

19      The Grand Jury charges:

20  ///

21  ///

22  ///

23

24

25

26

27

28

COUNT ONE

[18 U.S.C. § 1348(1)]

A.   INTRODUCTORY ALLEGATIONS

At times relevant to this Indictment:

The Defendant and Relevant Entities

1.   Defendant ANDREW LEFT, then a resident of Beverly Hills, California, was a securities analyst, trader, and frequent guest commentator on business cable news channels such as CNBC, Fox Business, and Bloomberg TV.

2.   Defendant LEFT did business as Citron Research ("Citron"), an online moniker he created as a vehicle for publishing investment recommendations.  Citron's online presence included a website, CitronResearch.com, and an account on the social media platform formerly known as Twitter with the handle @CitronResearch (the "Citron Twitter Account").

3.   In or around October 2018, defendant LEFT formed Citron Capital, LP, a pooled investment vehicle (hedge fund) incorporated in Delaware and registered as an investment adviser in California. Defendant LEFT owned 85 percent of Citron Capital, LLC, which was the general partner of Citron Capital, LP (collectively, "Citron Capital").

4.   Individual A was the minority partner in Citron Capital. Individual A was a securities analyst and trader who conducted research on publicly traded securities and executed trades at the direction of defendant LEFT.

5.   Using Citron's online platform, defendant LEFT disseminated commentary about publicly traded companies in which he asserted that the market incorrectly valued a company's stock (the "Targeted

Security"), advocating that the current price was too high or too low. Defendant LEFT's recommendations often included an explicit or implicit representation about Citron's trading position and a "target price," which defendant LEFT represented as his own view of the Targeted Security's true value.

6.   Defendant LEFT published his recommendations in Citron-branded reports, articles, and social media content and promoted them through media campaigns, including outreach to members of the news media, appearances on cable news programs, and interviews published in news articles online.  In connection with his media appearances and interviews, defendant LEFT was routinely required to disclose the positions that he and Citron held in a Targeted Security.

7.   Defendant LEFT knew that his recommendations influenced investors' decisions to buy or sell stock and thereby empowered him to manipulate the price of a Targeted Security.  By using the Citron Twitter Account to generate "catalysts" -- events with the ability to move stock prices -- defendant LEFT profited from his advance knowledge that he was about to trigger such movements in the market. But for the scheme to work, defendant LEFT knew that investors needed to believe that the recommendations and positions he set forth were sincerely maintained, and not merely vehicles for defendant LEFT to personally profit.  To maintain the false pretense that Citron's recommendations and positions were sincerely held, defendant LEFT made false and misleading representations and half-truths about his economic incentives, conviction in Citron's analyses, and valuations of Targeted Securities.  Because disclosing the truth would diminish his credibility, defendant LEFT made false and misleading statements and half-truths to deceive investors to believe that he held a

position when, in fact, after using his influence on the market to manipulate stock prices in a particular direction, defendant LEFT closed his positions to capitalize on the temporary price movement caused by his public statements.  Defendant LEFT used this deception and concealment to manipulate the market for his own financial gain.

<u>Stock Trading</u>

8.   An investor held a "long" position in the stock of a publicly traded company if the investor stood to gain financially from an increase in the price of that company's shares.  For example, the investor could own the security with the expectation that the shares would rise in price in the future.  An investor could also have a "long" position by buying "call" options that entitled the option-holder to purchase shares at a future date at a prearranged price (referred to as the "strike price") that the investor believed would be lower than the market price the security would have reached by that date.

9.   An investor held a "short" position in the stock of a publicly traded company if the investor stood to gain financially from a decrease in the price of that company's shares.  An investor could achieve a short position in various ways, including "short selling" shares of the company's stock or through the purchase of "put options."

a.   Short selling involved borrowing shares of a company's stock from a broker for a fee and then selling the borrowed shares. If the price of the shares decreased, the short seller could then return the borrowed shares to the broker by purchasing them at a lower price on the open market than the short seller originally sold them, thereby capturing the decline in the stock's price as a profit.

b.   When buying put options, the option-holder could force the counterparty to buy shares of a particular stock at a future date at a prearranged price.  If the price of the shares decreased by that future date, the option-holder could sell the counterparty those shares at a higher price than the option-holder could acquire them for on the open market, thereby profiting from the fall in the stock's price.

10.  "Short-dated options" expired and became worthless after a set duration, which could be as soon as the same day they are purchased.  Buying short-dated options could reflect a trader's bet that the price of the underlying security would move in a short timeframe before the contract expires.

11.  An investor could open or close trading positions by placing "limit" orders or "market" orders.  A limit order was an order to buy or sell a security if its price was available above or below a certain price, whereas a market order was an order to buy or sell at whatever price the security was then trading.  Placing a limit order could indicate the price at which a trader intended to buy or sell a security in the future.

12.  A "retail investor" was a non-professional, individual investor who purchased securities for their own personal accounts and generally traded and invested in dramatically smaller amounts and volumes as compared to institutional investors (i.e. mutual funds, hedge funds, or professional traders).

13.  Interactive Brokers LLC ("IB") and E*TRADE Securities Inc. ("E*TRADE") were online brokerage platforms that enabled individuals and institutions to trade stock shares, options, and other securities and financial instruments.  Defendant LEFT held accounts in his name

and in Citron Capital's name at IB (the "Citron IB Account") and at E*TRADE (the "LEFT E*TRADE Account") (collectively, the "LEFT Trading Accounts").

14.   The New York Stock Exchange ("NYSE") and the National Association of Securities Dealers Automated Quotations Stock Market ("NASDAQ") were "national securities exchanges" within the meaning of the Securities Exchange Act of 1934.

15.   The common stock and options to trade the common stock of American Airlines Group Inc. ("AAL"); Beyond Meat Inc. ("BYND"); Cronos Group Inc. ("CRON"); Facebook Inc. ("FB"); General Electric Company ("GE"); Luckin Coffee Inc. ("LK"); Namaste Technologies Inc. ("NXTTF"); Novavax Inc. ("NVAX"); Nvidia Corp. ("NVDA"); India Globalization Capital Inc. ("IGC"); Invitae Corp. ("NVTA"); Palantir Technologies Inc. ("PLTR"); PolarityTE Inc. ("PTE"); Roku Inc. ("ROKU"); Tesla Inc. ("TSLA") Twitter Inc. ("TWTR"); and XL Fleet Corp. ("XL") were securities.  AAL, BYND, CRON, FB, GE, LK, NVAX, NVDA, IGC, NVTA, PLTR, PTE, ROKU, TSLA, TWTR, and XL were issuers with a class of securities registered under section 12 of the Securities Exchange Act of 1934 (15 U.S.C. § 78$l$) and that were required to file reports under section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78o(d)).

<u>The Investigation into Illegal Market Manipulation</u>

16.   The Federal Bureau of Investigation ("FBI"), the United States Postal Inspection Service ("USPIS"), the United States Attorney's Office for the Central District of California ("USAO"), and the Fraud Section of the United States Department of Justice ("DOJ") were conducting a federal criminal investigation of defendant LEFT for federal crimes, including illegal market manipulation in

violation of the federal securities laws (the "Federal

Investigation").

17.   The United States Securities and Exchange Commission

("SEC") was an agency of the United States conducting a civil

investigation of defendant LEFT for violations of the federal

securities laws (the "SEC Investigation").

B.   THE SCHEME TO DEFRAUD

18.   Beginning no later than in or about March 2018, and

continuing through at least in or about October 2023, in Los Angeles

County, within the Central District of California, and elsewhere,

defendant LEFT, knowingly and with intent to defraud, devised,

participated in, and executed a scheme to defraud investors and

potential investors in connection with securities of issuers with a

class of securities registered under Section 12 of the Securities

Exchange Act of 1934 and that were required to file reports under

section 15(d) of the Securities Exchange Act of 1934, in violation of

Title 18, United States Code, Section 1348(1).

C.   THE OPERATION OF THE SCHEME

19.   The scheme to defraud operated, in substance, as follows:

a.   Knowing that Citron's reputation with investors had

the power to move markets, defendant LEFT selected a Targeted

Security about which he intended to publish commentary with the

intention of manipulating the Targeted Security's price.

b.   Defendant LEFT prepared commentary about the Targeted

Security for dissemination through Citron.  In some instances, the

commentary represented defendant LEFT's own work.  In other

instances, defendant LEFT disseminated as his own the commentary of

third parties, such as analysts at hedge funds.

c.    In the leadup to publication of Citron's commentary, defendant LEFT established long or short positions in a Targeted Security in one or both of his accounts, the LEFT Trading Accounts, such that defendant LEFT profited by taking advantage of the intended short-term movement in the Targeted Security's price caused by his commentary.

d.    To exploit his advance knowledge of the timing and subject of the forthcoming commentary on the Targeted Security, defendant LEFT often built his positions using inexpensive, short-dated options contracts that would expire within zero to five trading days and submitted limit orders to close his positions as soon as the Targeted Security reached a certain price.

e.    To maximize the impact of Citron's commentary on the price of the Targeted Security, and thus defendant LEFT's ability to profit from his advance knowledge that a price movement was about to be triggered, defendant LEFT caused Citron's commentary to be deceptive in numerous respects, including the following:

i.    Knowing that Citron's influence on the market was largely based on his personal reputation, defendant LEFT concealed the contributions of third parties, including hedge funds, in the preparation of Citron's commentary.  Defendant LEFT also maintained the false pretense that the content of the Citron's commentary was not tainted by any conflict of interest by concealing that he often provided these and other third parties, including in return for compensation, advance notice of the anticipated publication of Citron Reports to enable the third parties to profit by trading around the Citron Reports and/or mitigate their losses by adjusting their positions.

1          ii.   Knowing that Citron's influence on the market was

2    also based in large part on the public's perception that he was

3    confident in the content and conclusions of Citron's commentary,

4    defendant LEFT concealed his intention to trade a Targeted Security

5    in a manner inconsistent with the content and conclusions of Citron's

6    commentary by covering all or the majority of the positions he held

7    in the Targeted Security shortly after the Citron commentary on the

8    Targeted Security was published.

9          iii. To maximize the impact of Citron's commentary on

10   the price of a Targeted Security, defendant LEFT bolstered Citron's

11   credibility through false and misleading statements about its

12   research staff, process, independence, external investors, and

13   economic incentives.

14         iv.   To enhance the perception that he was confident

15   in the Citron commentary's conclusions and create the perception that

16   his analyses were rigorous, defendant LEFT often included a "target

17   price" for a Targeted Security which was purportedly derived from his

18   analyses and reflected his sincere projection of the Targeted

19   Security's future price.  In reality -- with the hope of triggering

20   not a pistol shot but a cannon blast -- defendant LEFT selected

21   extreme target prices to attract media attention and provoke an

22   immediate change to the prices of the Targeted Security while

23   concealing his intention to exit all or the majority of the positions

24   he held in the Targeted Security well before they reached -- if they

25   ever did -- the target price selected.

26         v.    To draw the attention of news-based trading

27   algorithms and to alarm investors, defendant LEFT included

28   sensationalized headlines and inflammatory language in the Citron

reports, such as "fraud" and "smoking gun."  In employing this rhetoric, defendant LEFT generally sought to maximize the impact on the price of the Targeted Security as quickly as possible and create the opportunity for defendant LEFT to profitably exit his position as quickly as possible.

f.   Knowing that Citron's influence on the market was largely based on the public's perception that he was confident in the content and conclusions in Citron's commentary, defendant LEFT made false and misleading representations about his and Citron's trading and concealed the fact that he intended to and did trade in a manner designed to exploit the temporary price volatility that Citron's commentary created.  To profit from the intended price movement triggered by Citron's reports and tweets, defendant LEFT covered all or substantially all of the positions he held in a Targeted Security, often within hours -- and sometimes minutes -- after publication.

g.   To buttress the public perception that defendant LEFT was committed to the views expressed in Citron's commentary, regardless of the immediate impact on the price of a Targeted Security, defendant LEFT engaged in media campaigns, appearing in podcast and television interviews and in print and online media, to promote his investment commentary, often including false and misleading statements.  These campaigns had the intended effect of amplifying defendant LEFT's ability to manipulate the price of the Target Securities.

h.   To create the false impression that he managed outside investors' money, in order to bolster his influence with the investing public and ability to artificially move securities prices, defendant LEFT made false and misleading statements -- including

10

publicly issuing "investor letters" -- to advance the false pretense that he successfully managed third-party investors' funds and was a credible investment adviser.  In fact, Citron Capital never had outside investors.

      i.  Knowing that Citron's influence on the market was largely based on defendant LEFT's personal reputation and market-moving capacity, defendant LEFT also falsely represented that he did not share Citron's commentary with hedge funds before the reports were published.  In truth, defendant LEFT often provided third parties, including hedge funds, with advance notice of the anticipated publication of Citron's commentary to enable the third parties to profit by trading around the commentary and, in other instances, mitigate their losses by adjusting their positions before publication.  For example:

      i.  Defendant LEFT coordinated with hedge funds to disseminate short reports and information to be posted on Twitter, coordinated with hedge funds regarding the timing of publication, and enabled the hedge funds to trade in the Targeted Securities before the reports were disseminated.  In exchange for sharing his planned announcements with the hedge funds in advance of posting them publicly, the hedge funds paid defendant LEFT a portion of their trading profits.

      ii.  To maintain the illusion of Citron's independence, and thus the credibility of Citron's commentary, defendant LEFT concealed Citron's financial relationships with hedge funds, and falsely represented to law enforcement that Citron "never" exchanged compensation with a hedge fund or coordinated trading with a hedge fund in advance of the issuance of its commentary.

iii. To conceal his coordination with and compensation from one hedge fund, defendant LEFT directed a third party to create false invoices requesting payments for research services even though no research services had been provided.  In truth, the payments were defendant LEFT's share of profits from the hedge fund's trading around Citron's publications and media campaigns.

20.  To maintain his scheme to manipulate the market and prevent his deceptive practices from being discovered, defendant LEFT:

a.  Communicated using encrypted messaging apps;

b.  Deleted electronic communications even when directed by the SEC to maintain those communications for use in its investigation into defendant LEFT and Citron's practices; and

c.  Made false statements when interviewed by federal law enforcement in connection with the Federal Investigation.

<u>Defendant LEFT's Use of Deceptive Reports</u>

<u>Cronos Group Inc. (CRON)</u>

21.  On or about August 27 and August 28, 2018, in electronic communications, defendant LEFT wrote Individual B, a portfolio manager for Hedge Fund A: "I have a hot voice in cannibas[;] Let's take a vantage of it"[;] and "what stock is alll retail . . .  the best shorts are retail shorts no doubt[;] we can make money in weed [;] i have good weed track record . . .  do we go long [other company] or short CRON . . .  we can DESTROY CRON," and "cron short we could get 2 bucks."

22.  At the open of the market on the morning of on or about August 29, 2018, defendant LEFT had no position in CRON.  At approximately 9:41 a.m., defendant LEFT began building a short position in CRON.  Prior to 10:07 a.m. on or about August 30, 2018,

1  defendant LEFT had built a short position of approximately 883,900

2  shares of short exposure to CRON (including a short equity position,

3  put options purchased, and call options sold).

4       23.  On or about August 30, 2018, at approximately 10:07 a.m.,

5  defendant LEFT posted on the Citron Twitter Account, including a link

6  to a Citron short report with the headline, "CRON: The Dark Side of

7  The Cannabis Space" and a tweet stating "$CRON tgt price $3.5.

8  Everything that is contaminated about the Cannabis space.  ALL HYPE

9  with possible securities fraud . . . ."  At the time of the tweet,

10  CRON was trading at approximately $11.50 per share.

11      24.  On or about August 30, 2018, at approximately 11:08 a.m.,

12  defendant LEFT posted again on the Citron Twitter Account, promoting

13  his short position on CRON, that, "Andrew Left from Citron on CNBC

14  Fast Money 5:25pm ET to discuss why $CRON is the most overhyped of

15  all the 'pot stocks' with a target price of $3.5[.]"

16      25.  Defendant LEFT placed orders to begin closing out his short

17  CRON position approximately 24 minutes after posting the first tweet.

18  By the close of the trading day, defendant LEFT had a net short

19  exposure of approximately 348,900 shares -- a reduction of

20  approximately 61% of defendant LEFT's total pre-CRON tweet position.

21      26.  Later on August 30, 2018, after the close of market,

22  defendant LEFT appeared on CNBC's "Fast Money" and defended his

23  characterization of CRON as a fraud. During the telecast, defendant

24  LEFT was directly asked -- twice -- about his own position in CRON.

25  The host followed up and asked, "Are you just as short the stock

26  right now as you were at the beginning of the day?" Defendant LEFT

27  falsely stated that he only covered a "small size" of his short

28  position in CRON earlier that day when, as defendant LEFT then knew,

at the time of his appearance on CNBC, he had already closed more than 60% of his pre-tweet positions.

27.  On or about August 31, 2018, in an electronic communication to Individual B, defendant LEFT wrote that once he realized that it was retail investors who owned CRON stock, his trades around Citron's commentary were like taking "candy from a baby."

28.  On or about October 4, 2023, and October 5, 2023, in an effort to conceal his market manipulation scheme, defendant LEFT falsely represented in testimony given under oath before the SEC that he did not target stocks that had large retail bases.

<u>Tesla, Inc. (TSLA)</u>

29.  On or about October 22, 2018, in the LEFT E*TRADE Account, defendant LEFT purchased short-dated call options, representing more than approximately 235,000 shares of TSLA stock, that expired three days later, on October 26, 2018.

30.  Or about October 23, 2018, defendant LEFT posted the following on the Citron Twitter Account to promote his long position on TSLA: "$TSLA dropping earnings on top of $F tomorrow might be a bad sign for shorts.  After reviewing all recent info on $TSLA dominating its categories, Citron is LONG Telsa for this quarter." Defendant LEFT also included a link to a Citron report on TSLA.  At the time, TSLA's stock was trading at approximately $266.

31.  Within one minute of announcing, "Citron is LONG Tesla for the quarter," defendant LEFT placed an order to sell call options representing approximately 120,000 shares of TSLA -- more than half of his pre-tweet position -- for a profit of at least $1 million.  By the close of the next trading day, on or about October 24, 2018, defendant LEFT sold approximately 81 percent of his pre-tweet

14

position for a profit of at least $6.6 million. This trading all occurred prior to TSLA's earnings announcement on or about October 24, 2018.

32.  Expecting that Citron's commentary on TSLA would invite others to question Citron's integrity and to advance the false pretense that defendant LEFT did not opportunistically trade around Citron's reports, defendant LEFT stated in the report:

> We know this note is going to have many critics, most being our fellow short sellers who might categorize us as opportunist. To anyone who challenges the integrity of Citron or our constant monitoring of the Tesla story all you have to do is look at the class action lawsuit recently filed against Tesla.  In it you will see the principal of Citron was actively trading tens of millions of dollars of Tesla and the infamous "$420" tweet resulted in a loss of almost $2 million.  By no means does Citron only trade on publishing stories.  We actively manage a book that has been trading Tesla for five years.

33.  On or about October 23, 2018, defendant LEFT appeared on CNBC to promote Citron's long report on TSLA.

### Nvidia Corp. (NVDA)

34.  On or about November 20, 2018, at approximately 8:40 a.m., in an electronic communication with Individual C, a portfolio manager, defendant LEFT wrote: "Do you want to make some fast money[.]  Put together a thesis why nvda is oversold . . . We can destroy it . . . Just read the analyst notes from this past quarter and assemble the best of the ideas."

35.  Later that morning, between approximately 9:40 a.m. and 10:17 a.m., defendant LEFT, through the LEFT Trading Accounts, opened long positions in NVDA, including short-dated call options that expired three days later.

36.  At approximately 10:17 a.m., defendant LEFT promoted NVDA as a favorable investment on the Citron Twitter Account, stating,

15

"Citron buys $NVDA.  This is the first time in 2 years stock offers an appealing risk-reward to investors . . . We see $165 before we see $120."  At the time, NVDA's stock was trading at approximately $144.

37.  Despite his representation that he expected NVDA's share price to rise to $165, less than two hours after announcing "Citron buys $NVDA," defendant LEFT sold 100 percent of his pre-tweet positions in the LEFT Trading Accounts when the NVDA was trading within a range of approximately $150 – $151, for a profit of at least $930,000.

Twitter, Inc. (TWTR)

38.  On or about December 20, 2018, defendant LEFT held approximately 145,000 share short equity position in TWTR stock in the LEFT Trading Accounts.  In the Citron IB Account, defendant LEFT bought short-dated put options, representing more than 1.2 million shares of TWTR stock, that expired on December 21, 2018.

39.  Prior to publishing a tweet concerning TWTR, at approximately 9:41 and 9:43 a.m., defendant LEFT entered limit orders to sell his put options in the Citron IB Account.

40.  At approximately 9:52 a.m., defendant LEFT posted on the Citron Twitter Account with a link to a Citron report about TWTR: "$TWTR has become Harvey Weinstein of social media.  Price tgt $20 Amnesty Intl study cannot be ignored by Wall St or Madison Ave. $TWTR will be forced to clean up the site and will have a fast impact on MAU[.]".  At the time of the tweet, TWTR's stock was trading at approximately $31.

41.  Within one trading day, defendant LEFT closed 100 percent of his short positions in TWTR in the LEFT Trading Accounts when TWTR

16

was trading within a range of $28 – $30 for a profit of at least $2 million.

42. On or about December 20, 2018, in private electronic communications, defendant LEFT and Individual A had the following conversation about their trading around Citron's tweet and report on TWTR:

| Defendant LEFT: | I feel like I want blood<br>Made some money back today on<br>the short side |
| Individual A: | $2m trade Twtr |
| Defendant LEFT: | Gives power for long |
| Individual A: | Not bad |
| Defendant LEFT: | Whew<br>If we bounce |
| Individual A: | Huge fucking day |
| Defendant LEFT: | Every news outlet is calling me |
| Individual A: | Love the title. Harvey Weinstein of<br>social media<br>Love twtr bounce |
| Defendant LEFT: | We will get another shot at it |

43. During the same conversation, defendant LEFT and Individual A discussed being "a tweet away" from meeting Citron's end of year target of $21 million.

Facebook, Inc. (FB)

44. On or about December 26, 2018, in the morning, defendant LEFT opened a long position in FB in the LEFT Trading Accounts, including approximately 20,000 shares of stock and short-dated call options representing approximately 340,000 shares of FB stock that expired in two days on December 28, 2018.

45.   On or about December 26, 2018, at approximately 9:52 a.m., defendant LEFT posted on the Citron Twitter Account, with a link to a Citron report on FB: "$FB Backing up the sleigh.  $160 tgt.  Citron presents the only information that counts on $FB looking past the rhetoric.  Would you rather have your kids addicted to Nicotine or Instagram?  Wall St answer will amaze you[.]"  At the time of the tweet, FB's stock was trading at approximately $129.

46.   To cause a temporary and artificial increase in the stock price of FB by which he could profit, defendant LEFT publicly stated in the Citron report that FB was Citron's "2019 S&P Stock of the Year."

47.   On or about December 26, 2018, in a private electronic communication, defendant LEFT explained his strategy to artificially manipulate the price of FB stock: "As crazy as it sounds when I put out reports and big names like this in the middle of the day what I'm really doing is switching algorithms" and "sometimes it works in a big way."

48.   Within six hours of posting Citron's tweet and report promoting his long position in FB, defendant LEFT sold the equivalent of approximately 320,000 shares, approximately 89 percent of his pre-tweet position in the LEFT Trading Accounts, at a time when FB was trading within a range of approximately $130 - $134.  Within 48 hours, defendant LEFT sold 100 percent of his pre-tweet long positions in FB for a profit of at least $680,000.

<u>Defendant LEFT's Use of Deceptive Tweets</u>

<u>Roku, Inc. (ROKU)</u>

49.   On or about January 8, 2019, between market open and approximately 9:40 a.m., defendant LEFT opened short positions in

18

ROKU including short-dated put options that expired within three trading days (on January 11, 2019) in the LEFT Trading Accounts.

50.   At approximately 9:41 a.m., defendant LEFT posted to the Citron Twitter Account that ROKU was "uninvestable."  At the time, ROKU's stock was trading at approximately $41.  Within two minutes of posting the tweet, defendant LEFT placed orders to exit his pre-tweet positions. In the Citron IB Account, defendant LEFT placed a limit order to exit his short equity position at $40.87, and by approximately 11:03 a.m. -- approximately one hour and twenty-two minutes after the tweet -- defendant LEFT exited his entire pre-tweet positions in the LEFT Trading Accounts.

51.   On or about January 8, 2019, at approximately 12:58 p.m., in an electronic communication, a ROKU investor told defendant LEFT, "One of these days you'll see the light on Roku."  In response, defendant LEFT stated: "Lol.  Was a great set up for Trade this morning."

52.   By on or about January 8, 2019, at approximately 1:20 p.m., defendant LEFT deleted the earlier tweet on ROKU from the Citron Twitter Account and falsely and misleadingly posted: "To clarify, we are watching ROKU from the side," when, in fact, defendant LEFT made at least $700,000 in profits from his manipulative statement and trading in ROKU that morning.

<u>Beyond Meat (BYND)</u>

53.   On or about May 17, 2019, defendant LEFT began to build a short position in BYND in the LEFT Trading Accounts.  Just prior to approximately 1:50 p.m. -- when Citron published a tweet on BYND -- defendant LEFT held a net short exposure of approximately 496,000 shares of BYND.  Included in defendant LEFT's position were put

options with a strike price of $90 that he purchased on or about May 17, 2019, which expired that same day. Just prior to the publication of Citron's tweet, BYND was trading at approximately $88.

54.  At approximately 1:50 p.m., defendant LEFT tweeted on the Citron Twitter Account: "$BYND has become Beyond Stupid. Most heavily traded retail stock on Robinhood, market cap now bigger than industry, and superior competitor coming to market soon. We expect $BYND to go back to $65 on earnings On retail exhaustion. [Look]"

55.  Within approximately three minutes of the tweet, defendant LEFT began closing his position in the Citron IB Account in BYND. Between approximately 1:52 and 2:02 p.m., within twelve minutes of posting the tweet, defendant LEFT sold the $90 put options that expired the same day.  At approximately 2:03 p.m., defendant LEFT had reduced his net short exposure (in options and equities) in the LEFT Trading Accounts to approximately 6,500 shares -- an approximately 98% reduction in his position.

56.  At approximately 2:08 p.m., defendant LEFT responded to an inquiry from CNBC concerning his position.  Defendant LEFT wrote back to CNBC: "Yes I shorted some today Seems to be all retail driven without any fundamental basis."  Defendant LEFT's statement was materially misleading because he had covered nearly his entire short position by this time.

57.  Defendant LEFT purchased additional $90 put options upon learning that CNBC would be publishing an article concerning BYND. By approximately 9:41 a.m. the next morning, on or about May 20, 2019, defendant LEFT had completely closed his entire position in BYND despite the price remaining above approximately $84 per share -- substantially above the $65 target price included in Citron's tweet.

American Airlines (AAL)

58.   On or about June 5, 2020, defendant LEFT opened short positions in AAL in the LEFT Trading Accounts that would generate a profit if AAL's stock price declined.  In addition to his equity short positions, between approximately 11:48 a.m. and 11:49 a.m., defendant LEFT purchased short-dated $19 and $20 put options, in the Left Trading Accounts, that expired the same day.  At the time of the trades, AAL was trading at approximately $20.

59.   At approximately 11:54 a.m., defendant LEFT posted on the Citron Twitter Account: "$AAL Back to $10 Robinhood traders have 0 idea what they [sic] buying.  Balance sheet is upside down. Unencumbered assets worth far less than current price.  The reason why Buffett fully exited lower.  They don't teach finance in the Sherwood Forest."

60.   Within ten minutes of posting the tweet announcing a target price of $10, defendant LEFT exited his short-dated options positions and placed limit orders to close his short equity positions in the LEFT Trading Accounts at prices ranging from $18 to $19.50.

61.   At approximately 12:08 p.m., defendant LEFT posted a second tweet on the Citron Twitter Account: "$AAL.  To clarify previous tweet the 25k new users on Robin Hood who bough [sic] stock at $19 must know more about airlines than Buffet who sold the stock at $11. Send your resumes to Omaha.  Expect stock to trade back to $10."

62.   By approximately 12:37 p.m., defendant LEFT completely closed his pre-tweet trades in the LEFT Trading Accounts for a profit of at least $429,000.

### Palantir (PLTR)

63.  On or about November 25, 2020, between approximately 9:04 and 9:58 a.m., defendant LEFT opened short positions in PLTR in the LEFT Trading Accounts that would generate a profit if PLTR's stock price declined.  In addition to his equity short positions, defendant LEFT purchased, through the Citron IB Account, short-dated put options that expired the same day.

64.  On or about November 27, 2020, at approximately 10:08 a.m., defendant LEFT posted on the Citron Twitter Account: "What a run the past month for all.  But as traders looking for short exposure, $PLTR is no longer a stock but a full casino.  Does not take a ball of crystal to know this will fall back to Arda [sic].  Shorting with a $20 2020 target."  At the time, PLTR's stock was trading at approximately $31.

65.  Approximately eight minutes after calling PLTR a "casino" stock and stating that Citron was "shorting with a $20 2020 target," defendant LEFT began closing his short positions in the Citron IB Account.  By market close, defendant LEFT completely closed the equity positions that he opened in the Citron IB Account immediately prior to posting the tweet.  At market close on or about November 27, 2020, PLTR was trading at approximately $28.

66.  The next trading day following the Thanksgiving holiday, on or about November 30, 2020, by approximately 10:54 a.m., defendant LEFT completely closed his short positions in the LEFT Trading Accounts.  Defendant LEFT's trading around the PLTR tweet resulted in profits of at least $820,000.

1

<u>XL Fleet Corp. (XL)</u>

2    67.  On or about December 23, 2020, between approximately 11:10

3 a.m. and 1:40 p.m., defendant LEFT purchased approximately 345,000

4 shares of XL stock in the LEFT Trading Accounts.

5    68.  At 1:37 p.m., approximately four minutes before posting a

6 tweet promoting his long position in XL, defendant LEFT placed a

7 limit order to sell his shares in the LEFT E*TRADE Account if XL rose

8 in price to $27.50 per share.  XL was trading at approximately $25

9 per share at this time.

10    69.  At approximately 1:41 p.m., defendant LEFT posted to the

11 Citron Twitter Account: "Citron long $XL tgt $60."  Approximately one

12 minute later, defendant LEFT placed a limit order to sell his shares

13 in the Citron IB Account if XL rose in price to $28.

14    70.  Within one trading day, defendant LEFT sold all of the XL

15 shares he purchased on or about December 23, 2020, in the LEFT

16 Trading Accounts for a profit of at least $1.7 million.

17

<u>Defendant LEFT's Deceptive Use of Investor Letters</u>

18    71.  In or around October 2018, defendant LEFT established

19 Citron Capital, a purported hedge fund, to advance the false pretense

20 that he successfully managed third-party investors' funds and was a

21 credible investment adviser.

22    72.  On or about October 30, 2018, defendant LEFT provided the

23 news outlet <u>Reuters</u> with a Citron Capital investor presentation that

24 indicated that defendant LEFT earned an average annualized return of

25 89.98 percent from his trading between 2007 and 2017.  Defendant LEFT

26 informed <u>Reuters</u> that, after investing only his own wealth for

27 roughly two decades, he had launched a hedge fund, that he planned to

28

raise "a few hundred million dollars" from investors, and that he would begin trading through the hedge fund in weeks.

73. On or about July 17, 2019, defendant LEFT disseminated an "investor letter" issued by Citron Capital asserting that, in the first half of 2019, "the Fund generated a gross return of 36.6% and net return of 24.7% after fees and expenses," and stating that, "the managers of Citron would like to reassure our investors that our focus remains on finding and trading around asymmetric opportunities on both the long and short side with processes and insights that have been developed over the past 20 years."

74. On or about December 23, 2020, defendant LEFT falsely represented that Citron had third-party investors in an interview in which he stated, "My investors don't pay me to be right.  My investors pay me to make money.  I'm not a professor.  I'm not supposed to have some erudite answer about the Fed and its effect on monetary flow.  Make money.  That's my directive from my investors."

75. On the following occasions, defendant LEFT disseminated "investor letters" to members of the news media to bolster his public reputation by advancing the false pretense that he managed a hedge fund with third-party investors:

    a.   On or about January 6, 2020, defendant LEFT disseminated an "investor letter" issued by Citron Capital, stating that in 2019, the hedge fund generated "a gross return of 56.4% and net return of 43.3%."

    b.   On or about January 4, 2021, defendant LEFT disseminated an "investor letter" issued by Citron Capital, stating that in 2020, the hedge fund generated "a gross return of 202% and net return of 155%."

76. At all times, Citron Capital did not have any third-party investors; it was entirely comprised of defendant LEFT's funds.

<u>Invitae Corp. (NVTA)</u>

77. Defendant LEFT also used Citron's purported investor letters as catalysts, that is, as vehicles for manipulating the prices of Targeted Securities to benefit defendant LEFT's trading positions.

78. On July 17, 2019, defendant LEFT sent Citron's investor letter for the first-half ("1H") of 2019 to members of the news media and stock commentators, who disseminated the content of the letter to the public. In the letter, defendant LEFT stated, "Going into the second half of 2019, on the long side we're most excited about our position in Invitae (NVTA). While Invitae was a contributor to fund performance during 1H 2019, we continue to add to our position at current levels" and "we see Invitae as the clear winner within the mega trend of the genetic testing market and expect the stock to trade to $100 in the next 24 months."

79. Beginning on or about the next day and continuing through the next week, while defendant LEFT was promoting Citron Capital's position in NVTA, he did not add to the fund's position. Instead, defendant LEFT reduced the fund's position in the Citron IB Account in NVTA by:

a. 20,000 shares on or about July 18;

b. 30,000 shares on or about July 23; and

c. 40,000 shares on or about July 25.

80. From on or about July 25 through on or about July 30, 2019, in private electronic communications with Individual D, defendant LEFT acknowledged his ability to artificially increase the price of

NVTA stating: "I can get stock [referring to NVTA's price] to 30" and "what can I put in a tweet to juice it[?]".

81.  On July 26, 2019, prior to publishing a positive Citron tweet and report about NVTA, defendant LEFT bought call options in the Citron IB Account, that positioned the fund to profit if NVTA's stock price rose.

82.  On July 30, 2019, in electronic communications, defendant LEFT privately messaged Individual E, a portfolio manager at Hedge Fund C, "NVTA you need to [own]."

83.  On July 31, 2019, defendant LEFT posted on the Citron Twitter Account with a link to a Citron report about NVTA.  The report stated:

> As noted in Citron Capital's 1H '19 investor letter, the fund has been long shares of Invitae ($NVTA) and will continue to stay long until the stock hits at least $65 as we believe it is on its way to $100.

> Citron's conviction on Invitae was strengthened by this week's purchase of Genomic Health ($GHDX) by Exact Sciences ($EXAS) in a $2.8 billion deal.

> We are not concerned about next week's earnings as we would happily buy more on any dip – we have seen this movie before and have learned from our mistakes. Our only question is who will acquire $NVTA?

84.  That same day, on or about July 31, 2019, defendant LEFT reduced the fund's position in NVTA by selling 130,000 shares in the Citron IB Account.

85.  During the following week, despite his statements on or about July 31, 2019, defendant LEFT sold the remaining shares and calls in the Citron IB Account to close the fund's existing position in NVTA.  From on or about July 17, 2019 to on or about August 6, 2019, the price of NVTA was within a range of approximately $21 to $28.

Defendant LEFT's Attempts To Conceal His Scheme

General Electric (GE)

86.  On or about August 16, 2019, defendant LEFT initiated a media campaign to discredit another activist short seller's short report on GE and artificially inflate the price of GE stock to benefit defendant LEFT's trading positions.

87.  On August 16, 2019, at approximately 8:12 a.m., defendant LEFT placed a limit order to buy 200,000 shares of GE stock at a price of $8.34, which was filled by approximately 8:14 a.m.  At approximately 9:38 a.m., defendant LEFT placed a limit order to sell the same shares if GE's stock price increased to $8.63.

88.  At approximately 10:44 a.m., defendant LEFT posted to the Citron Twitter Account: "Markopolos report on $GE was the worst that activist short selling has to offer.  Aggressive accounting is not fraud.  Disingenuous all the way through . . . ."  The post included a link that directed viewers to Citron's own GE report published on Citron's website.

89.  Defendant LEFT made false and misleading representations in Citron's GE report to manipulate the price of GE's stock and benefit his own trading positions.  Specifically, defendant LEFT represented that, "Citron took the opportunity to buy stock as well."  In truth, at the time defendant LEFT made the statement, he had already placed an order to sell his shares, and within approximately one hour of posting Citron's tweet and report on GE, defendant LEFT had sold all of his shares of GE for a profit of at least $70,000.

90.  Defendant LEFT also emailed a link to Citron's GE commentary to members of the news media, including CNBC, in an effort to fraudulently bolster defendant LEFT's credibility by promoting the

27

false pretense that defendant LEFT was independent, and free from financial conflicts of interest, and therefore, more credible than other activist investors.  Specifically, Citron's commentary stated:

a.   Markopolos "is being paid a % of profits from an unnamed hedge fund that is short GE," which had been the subject of a recent short report by Harry Markopolos.  "No credible hedge fund or short seller would ever do this."

b.   "[I]n 18 years of publishing, we [Citron] have never been compensated by a third party to publish research.  More important, compensation tied to the 'success of a trade' would not pass internal compliance nor would it pass compliance of any fund that Citron would collaborate with on ideas."

c.   "[U]sing full disclosures, short sellers have become an important facet of self-regulation of the markets.  Unfortunately, what we have just witnessed with Mr. Markopolos is reckless, dishonest, and most importantly secretive -- all which gives activist short selling a bad name."

91.   In reality, defendant LEFT had, in fact, been compensated by unnamed hedge funds that held short positions in the securities targeted in Citron's commentary, and Citron had no "internal compliance" limiting defendant LEFT's collaboration with hedge funds.

92.   Indeed, between in or about September 2018 and December 2018, defendant LEFT received more than $1 million from Hedge Fund A, and between in or about January 2019 and August 2019, defendant LEFT and Individual A received more than $1 million from Hedge Fund B.

93.   Defendant LEFT concealed his coordination with and compensation from Hedge Fund A and Hedge Fund B from Citron's followers, members of the media, regulators, and law enforcement,

1   among others, to further his scheme to manipulate the market and

2   defraud the investing public by perpetuating the false pretense that

3   his investment recommendations were credible and unbiased.

4   <u>Namaste Technologies (NXTTF) & India Globalization Capital (IGC)</u>

5      94.  In or around September 2018, defendant LEFT entered into an

6   agreement with Hedge Fund A to execute a short campaign targeting

7   Namaste Technologies, Inc (NXTTF), a company whose securities were

8   traded over-the-counter.  At the time, Hedge Fund A was participating

9   in a bought offering -- where an investment bank commits to

10  purchasing an entire offering from a company and then apportions it

11  to other interested clients -- and stood to benefit if Citron's short

12  campaign caused NXTTF's stock price to decline.

13     95.  On or about September 11, 2018, in exchange for defendant

14  LEFT's dissemination of negative information on NXTTF, Hedge Fund A

15  agreed to pay defendant LEFT a portion of Hedge Fund A's profits from

16  shorting NXTTF.

17     96.  On or about September 14, 2018, on the Citron Twitter

18  Account, defendant LEFT called NXTTF a "total joke," and advised

19  investors to "drop it like its hot" -- a reference to a pledge party

20  hosted by NXTTF and iconic rapper Snoop Dogg that employees of Hedge

21  Fund A attended on September 11, 2018.

22     97.  On or about September 25, 2018, in an interview for BNN

23  (Bloomberg TV's Canadian network), defendant LEFT discussed his

24  negative tweets about NXTTF and falsely stated, "I am going to keep

25  shorting NXTTF until it goes to zero."  Notwithstanding this

26  representation, the next day, in an electronic communication to an

27  executive of Hedge Fund A, defendant LEFT asked, "Should we cover all

28

Namaste and wait or keep some?"  The Hedge Fund A executive replied,
"We should cover a bunch."

98.  In or about October 2018, defendant LEFT and Hedge Fund A
worked together to execute a short campaign targeting India
Globalization Capital Inc. ("IGC"), a company whose securities were
traded on the NYSE under the ticker IGC.

99.  On or about October 2, 2018, on the Citron Twitter Account,
defendant LEFT posted:

   a.   "$IGC. If you are able to short, it is a gift.  No
product.  All hype.  Raised Money 2 weeks ago at $1.15  Finger
traders will get burned.  This hype stock is the poster child of a
cannabis bubble.  Always cautious but nothing but air. Could write
pages about this scheme."

   b.   "Correction. $IGC has raised money 3 times in 3 weeks
at an average price of $3.31.  At least the company is honest about
the absurd move  The stock should have a skull and crossbones at
Fidelity.  Just praying for more borrow to open up.  Target price -
$6 fast[.]"

100. On or about October 4, 2018, on the Citron Twitter Account,
defendant LEFT posted concerning NXTTF: "Citron proves without a
doubt the fraud being committed at Namaste Tech $n $nxttf. This $700
mil company will be a 0 one regulators and accountants read."  He
also included a link to a Citron short report on NXTTF.

101. Hedge Fund A's trading around defendant LEFT's short
campaigns targeting NXTTF and IGC generated profits of more than $3.8
million.  Defendant LEFT's share of these profits was more than $1.1
million.

102. Defendant LEFT directed Hedge Fund A to send defendant LEFT's share of the trading profits through a third-party intermediary to conceal the true beneficiary and purpose of the payments from Hedge Fund A to defendant LEFT.  Specifically, at defendant LEFT's direction, Individual F provided Hedge Fund A with false invoices on or about the following dates and in the following approximate amounts:

| Date | Description | Amount |
|------|-------------|--------|
| 10/08/18 | Research Services | $840,000 |
| 10/08/18 | Research Services | $390,000 |
| 10/08/18 | Research Services – Canopy Acquisitions & Slang | $100,000 |
| 10/15/18 | Research Services – Shopify | $250,000 |
| 10/22/18 | Research Services – Exchange Income | $210,000 |
| 10/26/18 | Research Services – Trupanion | $290,000 |
| 11/01/18 | Research Services – Arlo Netgear | $240,000 |
| 11/13/18 | Research Services – ACHC | $197,000 |

103. Upon receipt of payment of the false invoices by Hedge Fund A, Individual F sent wire transfers to a Citibank Account ending x7508, controlled by defendant LEFT, on or about the following dates and in the following approximate amounts:

///

| Date | Description | Amount |
|------|-------------|--------|
| 11/26/18 | Consulting Services from Jan 1 to April 30, 2018 | $250,000 |
| 12/05/18 | Consulting Services from May 1 to June 31, 2018 | $250,000 |
| 12/17/18 | Consulting Services from July 1 to Sept 31, 2018 | $250,000 |
| 12/24/18 | Consulting Services from Sept 31 to Dec 31, 2018 | $250,000 |
| 12/31/18 | Consulting Services from Nov 1 to Dec 31, 2018 | $137,000 |

104. On or about January 29, 2021, defendant LEFT knowingly and intentionally made the following materially false statements to a Postal Inspector from the USPIS while the Postal Inspector was in the Central District of California:

a.   When asked, "When you check with other hedge funds that specialize in the industry that you are looking at, is there compensation between the two of you?" defendant LEFT falsely stated that there was "[n]ever . . . never, never, never" compensation between himself and hedge funds.  In fact, as defendant LEFT then knew, from at least September 2018 through December 2018, defendant LEFT received compensation from Hedge Fund A after consulting with Hedge Fund A in advance of the issuance of Citron's commentary.

b.   When further asked, "Do you share your report before it goes public with [hedge funds]?" defendant LEFT falsely stated, "No, no, no, the only thing I might do . . . I might double check a spreadsheet . . . . [I]t's always done to make sure it's factually right."  In fact, defendant LEFT routinely shared the content of Citron's commentary with hedge fund managers in advance of publication to give them advanced notice and time to establish or adjust their trading positions and thereby profit or minimize losses from price volatility caused by Citron's publication.

105. On a date prior to January 30, 2021, electronic communications between defendant LEFT and individual A were cleared from the encrypted messaging app Telegram.

106. On or about February 1, 2021, the SEC provided defendant LEFT and Citron Capital with subpoenas for documents and notice that evidence, including, but not limited to, all communications through and content on the Citron Twitter Account, should be preserved and retained until further notice.  On or about March 14, 2023, despite the SEC's directive to retain such records for an ongoing investigation, defendant LEFT caused the deletion of electronic communications contained in the Citron Twitter Account.

<u>Defendant LEFT's Gains from the Fraudulent Scheme</u>

107. In furtherance of the scheme to defraud investors, defendant LEFT manipulated the market for at least 15 Targeted Securities and thereby fraudulently obtained profits of at least $16 million through transactions in the LEFT Trading Accounts.

COUNTS TWO THROUGH EIGHTEEN

[15 U.S.C. §§ 78j(b), 78ff; 17 C.F.R. § 240.10b-5]

108. The Grand Jury realleges paragraphs 1 through 17 and 19 through 107 of this Indictment here.

A.   THE SCHEME TO DEFRAUD

109. Beginning no later than in or about March 2018, and continuing through at least in or about October 2023, in Los Angeles County, within the Central District of California, and elsewhere, defendant LEFT, knowingly and willfully, directly and indirectly, by the use of the means and instrumentalities of interstate commerce and the mails and facilities of NYSE and NASDAQ, in connection with the purchase and sale of securities, used and employed manipulative and deceptive devices and contrivances by: (1) employing a scheme to defraud; (2) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (3) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon the market, including investors and potential investors in the Targeted Securities identified below, among others.

110. The scheme to defraud operated, in substance, as described in paragraphs 19 through 107 of this Indictment.

B.   EXECUTIONS OF THE FRAUDULENT SCHEME

111. On or about the following dates, within the Central District of California, and elsewhere, for the purpose of executing the scheme to defraud described above, defendant LEFT directly and indirectly caused the use of a means and instrumentality of interstate commerce and the facilities of NYSE and NASDAQ in

34

connection with the purchase and sale of securities by issuing Citron reports and tweets concerning the following issuers:

| COUNT | DATE | ISSUER IN CITRON PUBLIC STATEMENT |
|---|---|---|
| TWO | 08/30/2018 | CRON |
| THREE | 10/02/2018 | IGC |
| FOUR | 10/04/2018 | NXTTF |
| FIVE | 10/18/2018 | PTE |
| SIX | 10/23/2018 | TSLA |
| SEVEN | 11/20/2018 | NVDA |
| EIGHT | 12/20/2018 | TWTR |
| NINE | 12/26/2018 | FB |
| TEN | 01/08/2019 | ROKU |
| ELEVEN | 05/17/2019 | BYND |
| TWELVE | 07/31/2019 | NVTA |
| THIRTEEN | 08/16/2019 | GE |
| FOURTEEN | 01/31/2020 | LK |
| FIFTEEN | 04/20/2020 | NVAX |
| SIXTEEN | 06/05/2020 | AAL |
| SEVENTEEN | 11/27/2020 | PLTR |
| EIGHTEEN | 12/23/2020 | XL |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COUNT NINETEEN

[18 U.S.C. § 1001(a)(2)]

112. The Grand Jury realleges paragraphs 1 through 17 and 86 through 107 of this Indictment here.

113. On or about January 29, 2021, in Los Angeles County, within the Central District of California, and affecting the Federal Investigation in the Central District of California, and in a matter within the jurisdiction of the executive branch of the government of the United States, namely, the FBI, USPIS, the USAO, and DOJ, defendant LEFT knowingly and willfully made the following materially false statements and representations to USPIS knowing that these statements and representations were untrue:

a. Defendant LEFT falsely stated that he did not share Citron's reports with hedge funds before those reports became public except to check the factual accuracy of the report. In truth, defendant LEFT routinely shared the content of Citron reports with hedge fund managers in advance of publication to afford them time to establish or adjust their trading positions and thereby profit or minimize losses from price volatility caused by Citron's publication.

b. Defendant LEFT falsely stated that he "never, never, never" exchanged compensation with a hedge fund after consulting with that hedge fund in advance of the issuance of a Citron report. In truth, as defendant LEFT then knew, from at least September 2018 through December 2018, defendant LEFT received compensation from Hedge Fund A after consulting with Hedge Fund A in advance of the issuance of Citron's commentary.

36

1

FORFEITURE ALLEGATION

2

[18 U.S.C. § 981(a)(1)(C); 28 U.S.C. § 2461(c)]

3   114. Pursuant to Rule 32.2 of the Federal Rules of Criminal

4   Procedure, notice is hereby given that the United States of America

5   will seek forfeiture as part of any sentence, pursuant to Title 18,

6   United States Code, Section 981(a)(1)(C) and Title 28, United States

7   Code, Section 2461(c), in the event of defendant ANDREW LEFT's

8   conviction of any of the offenses set forth in Counts One through

9   Eighteen of this Indictment.

10   115. Defendant LEFT, if so convicted, shall forfeit to the

11   United States of America the following:

12       a.   All right, title, and interest in any and all

13   property, real or personal, constituting, or derived from, any

14   proceeds traceable to the offense; and

15       b.   To the extent such property is not available for

16   forfeiture, a sum of money equal to the total value of the property

17   described in subparagraph (a).

18   116. Pursuant to Title 18, United States Code, Section

19   981(a)(1)(c), as incorporated by Title 28, United States Code,

20   Section 2461(c), defendant LEFT, if so convicted, shall forfeit

21   substitute property, up to the total value of the property described

22   in the preceding paragraph if, as the result of any act or omission

23   of that defendant, the property described in the preceding paragraph,

24   or any portion thereof: (a) cannot be located upon the exercise of

25   due diligence; (b) has been transferred, sold to or deposited with a

26   third party; (c) has been placed beyond the jurisdiction of the

27   Court; (d) has been substantially diminished in value; or (e) has

28

1   been commingled with other property that cannot be divided without

2   difficulty.

3

4                                           A TRUE BILL

5

6                                            /s/

7                                           Foreperson

8   E. MARTIN ESTRADA                       GLENN S. LEON
    United States Attorney                  Chief, Fraud Section
9                                           Criminal Division
                                            U.S. Department of Justice
10

11  MACK E. JENKINS                         LAUREN ARCHER
    Assistant United States Attorney        MATTHEW REILLY
    Chief, Criminal Division                Trial Attorneys
12                                          Fraud Section
                                            Criminal Division
13  BRETT A. SAGEL                          U.S. Department of Justice
    Assistant United States Attorney
    Chief, Corporate and Securities
14      Fraud Strike Force

15  ALEXANDER B. SCHWAB
    Assistant United States Attorney
16  Deputy Chief, Corporate and
        Securities Fraud Strike Force

17

18

19

20

21

22

23

24

25

26

27

28