**DYNAMIS LLP**

ERIC S. ROSEN (*pro hac vice*)
erosen@dynamisllp.com
MICHAEL B. HOMER (*pro hac vice*)
mhomer@dynamisllp.com
225 Franklin St., 26ᵗʰ Floor
Boston, Massachusetts 02110
(617) 802-9157

YUSEF AL-JARANI (Cal. Bar No. 351575)
yaljarani@dynamisllp.com
1100 Glendon Ave., 17ᵗʰ Floor
Los Angeles, California 90024
(213) 283-0685

AARON KATZ (*pro hac vice*)
akatz@aaronkatzlaw.com
399 Boylston Street, 6ᵗʰ Floor
Boston, MA 02116
(617) 915-6305

*Attorneys for Defendant Andrew Left*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA | Case No. 2:24-cr-00456-VAP |
| v. | **DEFENDANT'S REPLY TO THE GOVERNMENT'S OPPOSITION TO THE MOTION TO DISMISS, IN PART, THE FIRST SUPERSEDING INDICTMENT** |
| ANDREW LEFT, | |
| Defendant. | |
| | Date:    April 7, 2026 |
| | Time:    11:00 a.m. |
| | Ctrm:    6A |
| | Judge:   Hon. Virginia A. Phillips |

1

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ...................................................................................................... 1

ARGUMENT ............................................................................................................. 2

I.   Count One Is Duplicitous and Must Be Dismissed. .......................................... 2

   A.   The Gravamen of a Crime Under Section 1348(1) Is the Execution of the
Scheme, Not the Scheme Itself. ............................................................... 2

   B.   The Government's Argument that Count One Charged a "Single, Coherent
Scheme" Confirms the Defense is Correct. .............................................. 5

   C.   The Ancillary Conduct Charged in Count One Mandates Dismissal of that
Charge. ...................................................................................................... 7

   D.   None of the Caselaw the Government Cited Supports Its Position. ........... 9

   E.   The Government's Proposed "Jury Instruction" Improperly Invites a Non-
Unanimous Verdict. ................................................................................ 11

   F.   The Prejudice to Mr. Left from the Government's Charging Decision Is
Overwhelming. ........................................................................................ 13

II.  The Indictment Fails to Allege a Cognizable Fraud Theory. .......................... 14

   A.   The Government Does Not Address the FSI's Repeated Use of the Word
"Conceal," Which Is an Omissions-Based Theory of Fraud. .................. 14

   B.   The Government Cannot Re-Label Statements as Being False and Misleading
to Evade an Omissions Theory of Fraud. ............................................... 15

   C.   The Government's Reliance on the Half-Truth Doctrine Is Improper. ....... 17

   D.   The Government's Reliance on Mahaffy and Its Progeny Is Misplaced. ... 20

CONCLUSION ....................................................................................................... 22

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## <u>Cases</u>

*Chiarella v. United States,*
445 U.S. 222 (1980) .................................................................19, 20, 21

*Macquarie Infrastructure Corp. v. Moab Partners,*
601 U.S. 257 (2024) .................................................................17

*Neder v. United States,*
527 U.S. 1 (1999) .................................................................21, 22

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund,*
575 U.S. 175 (2015) .................................................................17

*Richardson v. United States,*
526 U.S. 813 (1999) .................................................................12

*SEC v. Capital Gains Rsch. Bureau, Inc.,*
375 U.S. 180 (1963) .................................................................19

*United States v. Allender,*
62 F.3d 909 (7th Cir. 1995).................................................................6

*United States v. Bryan,*
868 F.2d 1032 (9th Cir. 1989).................................................................2, 10

*United States v. Colton,*
231 F.3d 890 (4th Cir. 2000).................................................................3, 5, 6

*United States v. Curran,*
643 F. Supp. 3d. 921 (S.D. Iowa 2022).................................................................3

*United States v. De La Mata,*
266 F.3d 1275 (11th Cir. 2001).................................................................3

*United States v. Haddy,*
134 F.3d 542 (3d Cir. 1998).................................................................9, 10

*United States v. Hinton,*
127 F. Supp. 2d 548 (D.N.J. 2000) .................................................................4

*United States v. Hussain,*
972 F.3d 1138 (9th Cir. 2020).................................................................8

*United States v. Lapier,*
796 F.3d 1090 (9th Cir. 2015).................................................................12, 13

- ii -

*United States v. Laurienti,*
611 F.3d 530 (9th Cir. 2010).....................................................................20

*United States v. Lemons,*
941 F.2d 309 (5th Cir. 1991)........................................................................3

*United States v. Lilly,*
983 F.2d 300 (1st Cir. 1992).........................................................................3

*United States v. Lonich,*
2016 WL 324039 (N.D. Cal. 2016).............................................................21

*United States v. Mahaffy,*
693 F.3d 113 (2d Cir. 2012).......................................................................21

*United States v. Melvin,*
143 F. Supp. 3d 1354 (N.D. Ga. 2015)........................................................3

*United States v. Molinaro,*
11 F.3d 853 (9th Cir. 1993).....................................................................3, 4

*United States v. Morse,*
785 F.2d 771 (9th Cir. 1986).........................................................................2

*United States v. Nichols,*
2008 WL 5233199 (C.D. Cal. 2008).............................................................4

*United States v. O'Brien,*
2017 WL 5192032 (N.D. Ill. 2017).......................................................10, 11

*United States v. Payseno,*
782 F.2d 832 (9th Cir. 1986).......................................................................13

*United States v. Powers,*
2011 WL 13108655 (D.N.M. 2011)...............................................................3

*United States v. Ramsey,*
2022 WL 596378 (E.D. Pa. 2022)...............................................................10

*United States v. Romero-Coriche,*
840 Fed. App'x 138 (9th Cir. 2020)............................................................12

*United States v. Santos,*
553 U.S. 507 (2008)..............................................................................9, 22

*United States v. Schock,*
2017 WL 4780614 (C.D. Ill. 2017)..............................................................11

*United States v. Skelly,*
442 F.3d 94 (2d Cir. 2006).........................................................................18

- iii -

*United States v. Tanner*,
  471 F.2d 128 (7th Cir. 1972)..................................................................11

*United States v. Yagman*,
  2007 WL 9724388 (C.D. Cal. 2007)..................................................4, 6

*Zweig v. Hearst Corp.*,
  594 F.2d 1261 (9th Cir. 1979)..............................................................18

## <u>**Statutes**</u>

18 U.S.C. § 1001 .........................................................................................8

18 U.S.C. § 1341 .........................................................................................2

18 U.S.C. § 1344 ......................................................................................3, 4

18 U.S.C. § 1348 ................................................................................*passim*

2:24-cr-00456-VAP
REPLY IN SUPPORT OF MOTION TO DISMISS, IN PART, THE FIRST SUPERSEDING INDICTMENT

# **INTRODUCTION**

The Government's Opposition (Dkt. 205) to Mr. Left's Motion to Dismiss confirms the very deficiencies the defense identified. Count One is duplicitous, and the Government's attempts to defend it only deepen the problem.

The Government does not dispute that Count One charges conduct involving nearly two dozen separate securities—each involving different publications, trading activity, and alleged misrepresentations. Nor does it dispute that Count One includes conduct unconnected to any covered security: fake invoices, deleted communications, false statements to law enforcement, and trading in a stock (Namaste) the Government concedes is not covered by §1348.

The Government's sole response is that all this conduct constitutes a single "scalping scheme." But §1348(1) does not criminalize schemes. As the statute (and caselaw) clearly explains, the unit of prosecution—what the statute actually criminalizes—is the *execution* of the scheme to defraud. Each *execution* is a separate offense. The Government does not dispute it charged twenty-one separate executions in one count. That is textbook duplicity.

The Government's proposed cure is a jury instruction requiring unanimity as to "at least one" covered security. This means that each of the 12 jurors could reach entirely different conclusions as to which of the 20 stocks comprised the scheme, but still convict Mr. Left of the crime. This is nonsensical. It is a concession that each security is a discrete unit of prosecution, followed by an instruction that relieves the jury of the obligation to agree on which one the defendant committed. The Sixth Amendment does not permit this.

The fraud-by-omissions theory fares no better. The Government's Opposition extensively detailed the specific statements it claims were false or misleading, but then argued §1348 is so broad it doesn't need to prove any of them. Both positions

cannot be true. The Government's own description of the alleged fraud—recommending securities "without disclosing" an intent to trade in the opposite direction—is, by definition, an omissions theory. An omissions theory requires a duty to disclose. The Government has never identified one.

## ARGUMENT

## I.    Count One Is Duplicitous and Must Be Dismissed.

The Government does not dispute that Count One charges conduct involving nearly two dozen securities, with each security involving a different Citron publication, analytical claims, trading activity, and alleged misrepresentations. It also does not dispute that Count One includes conduct unrelated to trading in securities and not in connection with a covered security. Its sole response is that Count One charges a single "scalping scheme" and that the unit of prosecution under §1348 is the scheme, not the security. That argument fails.

### A.    The Gravamen of a Crime Under Section 1348(1) Is the Execution of the Scheme, Not the Scheme Itself.

The Government's response begins with the false premise that the gravamen of securities fraud under §1348(1) is "the scheme to defraud, not any particular security transaction." Opp. 3. Not so. The gravamen of the crime of securities fraud is the *execution* or *attempted execution* of the scheme to defraud. *See* §1348(1) ("Whoever knowingly *executes*, or *attempts to execute*, a scheme or artifice – (1) to defraud any person in connection with … any security" covered by the statute).[1] The verb used in the statute is "executes," which is singular and transactional. *See, e.g.*, *United States*

---

[1] The Government consistently relies on mail- or wire-fraud cases like *United States v. Morse*, 785 F.2d 771 (9th Cir. 1986) and *United States v. Bryan*, 868 F.2d 1032 (9th Cir. 1989). But mail and wire fraud punish those who devise the scheme—"Whoever, having devised or intending to devise any scheme or artifice to defraud" (§§1341/1343)—while bank and §1348 securities fraud punish the execution of the scheme. The statutes' text is different, and must be interpreted differently in the duplicity analysis. As described herein, the caselaw for bank fraud (securities fraud's closest model) is clear that a single scheme can be executed multiple times, and each execution is a separate crime.

*v. Melvin*, 143 F. Supp. 3d 1354, 1381 (N.D. Ga. 2015) ("§1348 criminalizes the execution of a scheme to defraud," "a single scheme can be executed a number of times," and "each securities transaction was an execution of the scheme to defraud, thereby constituting a separate offense").

This is because §1348(1) mirrors the §1344(1) bank fraud statute—"[w]hoever knowingly *executes, or attempts to execute*, a scheme or artifice … to defraud a financial institution." *See United States v. Molinaro*, 11 F.3d 853, 860 (9th Cir. 1993) (bank fraud "unit of offense" is "each *execution or attempted execution* of the scheme to defraud"). Defendant's Motion raised this point repeatedly (Dkt. 185 at 7–9), but the Government ignored it and instead cites almost exclusively to mail- and wire-fraud cases, which have a different statutory structure.

This distinction is critical because, just as the unit of prosecution for mail fraud is each individual mailing, here, "each *execution* of a scheme to defraud constitutes a separate indictable offense." *United States v. Curran*, 643 F. Supp. 3d. 921, 923–24 (S.D. Iowa 2022) (the offense in a bank fraud case is the execution of the scheme, not scheme itself); *Molinaro*, 11 F.3d at 860 (same); *United States v. De La Mata*, 266 F.3d 1275, 1287 (11th Cir. 2001) (same); *United States v. Lilly*, 983 F.2d 300, 302–05 (1st Cir. 1992) (same); *United States v. Lemons*, 941 F.2d 309, 318 (5th Cir. 1991) (same). This is true even when the conduct, *in toto*, constitutes a single scheme. *See, e.g.*, *United States v. Colton*, 231 F.3d 890, 909–10 (4th Cir. 2000) ("A single scheme can, however, 'be executed a number of times'") (citation omitted) (collecting cases); *United States v. Powers*, 2011 WL 13108655, *4 (D.N.M. 2011) (endorsing 17 separate charges for single scheme because each wire transmission was separate execution of the scheme).

The Government attempts to distinguish §1344(1) bank fraud by arguing that the term "financial institution" identifies the "victim," not the unit of prosecution.

This misses the point. The unit of prosecution under both statutes is the execution of the scheme, not the victim. Both statutes use identical operative language: "knowingly executes, or attempts to execute, a scheme or artifice." Both require that each execution be charged separately. *See United States v. Hinton*, 127 F. Supp. 2d 548, 554–56 (D.N.J. 2000); *Molinaro*, 11 F.3d at 860. *United States v. Yagman*, 2007 WL 9724388, at *13–14 (C.D. Cal. 2007), confirms the framework: the mail and wire fraud statutes punish each mailing or wire as separate counts, while the bank fraud statute—like §1348 securities fraud—punishes each execution of the scheme. The defense is not arguing each trade must be separately charged, but that each execution—establishing a position in a security, publishing commentary about that security, and trading on the resulting price movement—must be. *See, e.g.*, *United States v. Nichols*, 2008 WL 5233199, *4 (C.D. Cal. 2008) (charging single security in §1348 count).

The Government's own filings concede the point. The Opposition describes each security as a separate *execution* of the scheme to defraud: "defendant used his Citron platform to take a position in a stock, publish false and misleading commentary designed to move the price, then trade opposite to his stated view to profit from the artificial price movements." Opp. 1. The FSI does the same—alleging that each untrue public statement concerning a security was a separate execution of the scheme to defraud (FSI ¶134), and dedicating separate sections to each security's execution. *See, e.g.*, FSI ¶¶21–28 (Cronos), ¶¶29–35 (PolarityTE), ¶¶36–40 (Tesla), ¶¶41–44 (Nvidia), ¶¶45–50 (Twitter). Hence, twenty-one securities, twenty-one separate executions, each involving distinct transactions, misrepresentations, trading patterns, and market impacts. Lumping all these stocks, transactions, and alleged misrepresentations into a single count asks the jury to return one verdict on a grab-bag of unrelated conduct. That is duplicity.

### B. The Government's Argument that Count One Charged a "Single, Coherent Scheme" Confirms the Defense is Correct.

Because the execution of the scheme is the gravamen of securities fraud, the Government's argument that Count One is not duplicitous because it charges a "unified scheme with a consistent *modus operandi*: defendant used his Citron platform to publish false and misleading stock commentary designed to move stock prices, while concealing that he intended to—and did—trade opposite to his publicly stated views to capture the resulting artificial price movements," is wrong and irrelevant. Opp. 8.

A scheme is a plan or program of action. *See Scheme*, MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/scheme. A "scheme" is just the first step in violating §1348(1); indeed, a scheme requires no affirmative acts at all. The statute also requires someone to execute or attempt to execute that "scheme." That is the crime. Each execution of the scheme—regardless of whether there is one or multiple schemes—is a separate crime. *See Colton*, 231 F.3d at 909. As described, given the statute's express requirement that the execution be "in connection with" a covered security, it is clear that the execution of the scheme must be premised on a single covered security.

The Government, while harping on the word "scheme," never grapples with the dispositive question as to what the "execution" of that scheme entails. When (or how) is the scheme executed? At what point, if the scheme involves 21 different securities with different trading windows, sources of information, and profits, does the scheme shift from becoming just a plan to an actual completed scheme to defraud, meaning that any further executions would need to be charged in separate counts? The Government does not say, because their argument makes little sense. The Government

is attempting to read the *actus reus* of the charge—the *execution* of the scheme to defraud—out of the statute entirely. This is fatal to their argument.[2]

The Government's related contention, that "the fake invoices, investor letters, Twitter deletions, and SEC statements" are "acts in furtherance of the overarching scheme" (instead of "free-standing offenses grafted onto Count One"), also fails because these are *not* acts in furtherance of a singular scheme. Opp. 10. In *Colton*, the court examined the question whether conduct was in "furtherance of the scheme" (in which case it did not have to be separately charged) or whether it was a "separate execution of a scheme to defraud" (requiring a separate count). 231 F.3d at 909. As the court explained, "[w]hen an act is 'chronologically and substantively independent' from the other acts charged as the scheme, it constitutes *an execution*" of the scheme. *Id.* (citation omitted) (collecting cases).

As examples, "separate loans," "separate extensions of a loan agreement," or "separate diversions of funds" are each separate executions of a scheme properly "chargeable in a separate count of the indictment, even though each was a part of a *single scheme to defraud a single financial institution*." *Id.* Only where there is evidence that acts are "planned or contemplated together" or so "integrally related; one could not have succeeded without the other," are the acts in furtherance of the scheme such that they do not require separate charged counts. *Id.*; *see also Yagman*, 2007 WL 9724388, at *14 (same); *United States v. Allender*, 62 F.3d 909–10 (7th Cir. 1995) (acts that are "chronologically and substantively independent" are each separate executions of a scheme).

Given this guidance, it is unquestionable that in addition to each security being a separate execution requiring a separate count, all the ancillary acts alleged by the

---

[2] If the "scheme itself" were the unit of prosecution under §1348, the Government could charge a hundred separate stock frauds in a single count so long as it labels them one "scheme." That theory has no limiting principle, and the duplicity doctrine exists to prevent it.

Government in Count One are also separate executions requiring separate counts. The Twitter deletions and SEC testimony occurred *years after* any charged stock trading. The FSI does not allege these actions were either contemplated at the time of the securities trading or integrally related to any of the other executions of the scheme. Likewise, there is no evidence that false invoices were planned or contemplated when Mr. Left made his public statements concerning Namaste. To the contrary, it was Anson that concocted this separate scheme well *after* the trading took place. The use of investor letters also had nothing to do with any of the underlying stock tickers or the success of the scheme. Finally, as alleged, Mr. Left's actual trading in Namaste (a non-covered stock included in Count One) was separate and apart from the other qualifying tickers. Thus, the above-described acts are *not* acts in furtherance of the scheme, but rather separate executions (even if part of a single scheme to defraud) that must be charged in separate counts.

**C.    The Ancillary Conduct Charged in Count One Mandates Dismissal of that Charge.**

Although the Government is required to charge all the ancillary acts—the fake invoices, Namaste, investor letters, Twitter deletions, and SEC statements—in Count One as separate crimes, it cannot do so because these acts were not "in connection with … any security" covered by the statute. On this ground alone, Count One must be dismissed.

Indeed, the Government concedes its "theory is not that Namaste is itself a covered security under Section 1348(1), but that defendant's conduct involving Namaste was part of his broader scheme, which was executed 'in connection with' covered securities." Opp. 15. Citing no caselaw for the proposition, the Government then announces that the "in connection with" element "requires only that the scheme

- 7 -

bear a sufficient connection to a covered security, not that every individual act within it involve one." *Id.* Not so.

"In connection with" is an element of the offense. *United States v. Hussain*, 972 F.3d 1138, 1146 (9th Cir. 2020) (under §1348, it is an element of the offense that the scheme be "in connection with the purchase or sale of securities"). The Government must prove it beyond a reasonable doubt. Its concession that "not … every individual act" needs to satisfy this element is an admission that Count One charges Mr. Left with conduct that is *not* a crime under §1348.

The problem is not limited to Namaste. The FSI alleges, as part of Count One's "scheme," that Mr. Left submitted false invoices to conceal payments from hedge funds (FSI ¶19(e)(iii)), deleted electronic communications in defiance of SEC directives (¶20(b)), and made false statements to federal law enforcement (¶20(c))— the last of which is charged as a separate offense in Count 18 under §1001. None of this conduct is "in connection with … any security of an issuer." The Government claims the fake invoices "concealed hedge fund relationships to preserve the illusion of Citron's independence," the investor letters "bolstered defendant's credibility," and the deletions "obstructed investigations to prevent detection." Opp. 10. But none of these descriptions are in connection with a covered security.

The Government is connecting these ancillary acts to securities fraud only through a tenuous causal chain: these acts supported the scheme; the scheme generally involved securities; therefore, these acts are "in connection with" securities. This connection is circular—Namaste (for example) is part of the scheme; the scheme involves covered securities; therefore, Namaste satisfies "in connection with." By that logic, any conduct by any defendant who also happens to trade in covered securities can be bootstrapped into a §1348 charge. A defendant's choice of breakfast cereal is

- 8 -

1    "in connection with" securities if eating breakfast "supported and advanced" the
2    defendant's ability to execute the scheme that day.

3         This is not a hypothetical concern but the architecture of Count One. The
4    Government has built a single count encompassing 21 securities (one of which it
5    concedes is not covered), fake invoices, deleted tweets, and false statements to law
6    enforcement, and asks this Court to let a jury convict on all of it with a general verdict
7    not requiring the jury to find that each act satisfies §1348's elements. That is precisely
8    the kind of structural deficiency the duplicity doctrine exists to prevent. If each
9    security were charged separately, the Court and the jury could evaluate whether the
10   conduct alleged as to *that security* satisfies the "in connection with" requirement. The
11   single-count structure makes that evaluation impossible.[3] *See United States v. Santos*,
12   553 U.S. 507, 514 (2008) (rule of lenity requires ambiguous criminal statutes to be
13   construed in the defendant's favor).

14        Last, the Government argues that the ancillary acts are described in a "speaking
15   indictment" that "puts [the defendant] on notice." Opp. 10. But background facts in a
16   speaking indictment are not supposed to become the basis for conviction. The
17   Government wants it both ways: it wants these acts to be part of the charged "scheme"
18   (so the jury can consider them in voting guilty on Count One), but it also wants to
19   characterize them as mere "notice" allegations (so it doesn't have to prove they satisfy
20   §1348's elements). This is improper. If they are background allegations for notice
21   purposes, they should not be part of Count One's scheme at all.

22        **D.    None of the Caselaw the Government Cited Supports Its Position.**
23        The Government's reliance on *United States v. Haddy*, 134 F.3d 542 (3d Cir.
24   1998), is puzzling because *Haddy* confirms the defense's argument. The issue in

25   _____

26   [3] The Government argues Counts 2–17's per-security structure reflects "different
     statutory elements, not a concession about Section 1348's unit of prosecution." Opp.
27   15. But the "scheme itself" cannot be the unit of prosecution under §1348. *Supra* n.2.

28

*Haddy* was whether each purchase or sale of securities needed to be charged separately. The court held it did not, but endorsed the fact that each issuer was charged in a separate count, stating "each count properly charged a manipulation of the securities of each of the three separate companies—each involving a discrete scheme." *Id.* at 549. That is exactly what the defense is arguing here. The defense is not saying that each trade must be charged separately. The defense is asking this Court to rule as the court in *Haddy* did: each security, one count.

The same is true of *United States v. Ramsey*, 2022 WL 596378 (E.D. Pa. 2022), where the Government charged insider trading in two stocks in two separate counts, one count per security. *Id.* at *1–2. And the Government has no answer for its charging decision in *United States v. Constantinescu*, No. 22-cr-00612 (S.D. Tex.), where the Government charged 18 securities in separate counts under §1348. The Government asserts it has "discretion in how to charge" and may "charge the overall scheme as a single count, or it may charge individual executions as separate counts." Opp. 8. But this concedes the point. Each security *is* an "individual execution." The Government cites no case for the proposition that dozens of separate executions can be compressed into a single count. Nor could it. That is duplicity.

*United States v. Bryan*, 868 F.2d 1032 (9th Cir. 1989), fares no better. *Bryan* was a mail-fraud case where the defendant was charged with 20 separate counts, one for each mailing. The court rejected the argument that defrauding "a variety of victims is necessarily duplicitous"; but that argument is not made here. *Bryan* confirms that the unit of prosecution for mail fraud is each individual mailing. Likewise, the unit here is each covered security.

*United States v. O'Brien*, 2017 WL 5192032 (N.D. Ill. 2017), *aff'd*, 953 F.3d 449 (7th Cir. 2020), is worse still for the Government. The *O'Brien* indictment alleged a lengthy scheme to defraud—but charged only one execution per count: a single

- 10 -

mailing for mail fraud, a single bank for bank fraud. The court distinguished cases where indictments were duplicitous, reasoning: "[t]he fact that the indictment clearly charges *only one execution in each count* goes a long way toward satisfying Rule 7(c)(1)'s requirement of 'adequately inform[ing] the defendant of the nature of the charges against h[er].'" *Id.* at *3 (citation omitted). The court distinguished *United States v. Tanner*, 471 F.2d 128 (7th Cir. 1972), which found an indictment duplicitous where the government "delineate[d] as a single offense all trips [transporting explosives] that occurred within a period of time" without identifying which trip was the offense, and *United States v. Schock*, 2017 WL 4780614, at *20–21 (C.D. Ill. 2017), which found an indictment duplicitous where "the Government has made it impossible for Defendant (and the court) to determine which disbursement … gave rise to the allegations." *Id.* Here, as in *Tanner* and *Schock*, the Government has not identified which of the 21 stocks constitutes the "execution" of the scheme that "gave rise to the allegations" of Count One. This mandates dismissal.

### E.    The Government's Proposed "Jury Instruction" Improperly Invites a Non-Unanimous Verdict.

The Government proposes that the "jury can be instructed that it must unanimously agree the government proved beyond a reasonable doubt that defendant executed a scheme to defraud in connection with at least one covered security." Opp. 11. This proposed instruction is not a cure for duplicity but a confession of it.

The Government's acknowledgement that the execution of the scheme must be in "connection with at least one covered security" is a concession that the defense's unit-of-prosecution arguments (each covered security is a separate execution) are correct.

Regardless, the Government's proposed charge is not the law. Under the Government's instructions, the jury would not need to agree as to *which* execution of

- 11 -

the scheme Defendant committed.[4] The twelve jurors will examine 20 different covered securities, and each juror could find fraud as to an entirely different security. That's not unanimity. Moreover, it will be impossible for this Court to determine which securities, if any, supported the basis for Mr. Left's conviction.

The "at least one" language makes clear the Government is asking the Court to instruct the jury it can convict Mr. Left without ever agreeing on what he actually did. That's the exact evil the unanimity requirement exists to prevent. *See United States v. Romero-Coriche*, 840 Fed. App'x 138, 140 (9th Cir. 2020) (reversing on plain-error standard where counts were duplicitous and there was a "genuine possibility" that "different jurors voted to convict on the basis of different facts establishing different offenses"). The Sixth Amendment guarantees the right to a unanimous verdict on each element of each offense. *United States v. Lapier*, 796 F.3d 1090, 1097 (9th Cir. 2015) (reversing on duplicity grounds after failure to give unanimity instruction when evidence tended to show multiple conspiracies instead of the single conspiracy charged).

Because the unit of criminal conduct is the execution of the scheme with respect to a particular security, the jury must unanimously agree on *which* execution the Government proved beyond a reasonable doubt. If the securities were each properly charged in separate counts, the jury would have to do that. By lumping them into one count, the Government is eviscerating Mr. Left's right to a unanimous verdict. *See Romero-Coriche*, 840 Fed. App'x at 139–40.

This has been the law of the land for nearly three decades. In *Richardson v. United States*, 526 U.S. 813 (1999), the Supreme Court held that the jury must not only agree that the defendant committed a "continuing series of violations," but must unanimously agree on which specific violations make up that series. The same

---

[4] The Government's reliance on *Morse* is inapt. *Supra* n.1.

principle applies here. The Government cannot ask twelve jurors to examine 21 different securities and return a guilty verdict without unanimously agreeing on which security or securities—which *execution(s)* of the scheme—were proven beyond a reasonable doubt. Without such an instruction, the jury could undoubtedly "convict as the result of different jurors concluding that the defendant committed different acts." *Lapier*, 796 F.3d at 1097; *United States v. Payseno*, 782 F.2d 832, 836 (9th Cir. 1986) ("[W]hen it appears … a conviction may occur as the result of different jurors concluding that the defendant committed different acts, the general unanimity instruction does not suffice. To correct any potential confusion in such a case, *the trial judge must augment the general instruction to ensure the jury understands its duty to unanimously agree to a particular set of facts*.").

Last, the Government's proposed instruction compounds the prejudice. How can Mr. Left tailor a defense when the jury can convict on any one of 21 securities without specifying which? The right to present a defense becomes meaningless when the target is that diffuse. In addition, if Mr. Left is convicted on one count covering 21 securities with an "at least one" instruction, and the Government later wants to prosecute on a different security from the same bundle of stocks, there is no jeopardy bar. Nobody will be able to determine which security the jury found Mr. Left guilty of and which served as a basis for acquittal. The Government's own instruction manufactures the ambiguity that makes double-jeopardy protections unworkable.

### F.    The Prejudice to Mr. Left from the Government's Charging Decision Is Overwhelming.

The Government's single-count charging structure is not merely a technical defect. It produces three forms of concrete prejudice.

*First*, it deprives Mr. Left of his right to a unanimous jury verdict on each offense. A jury could believe the allegations as to some securities but not others. With 21 securities in one count (one of which is not even a covered security), the jury would

- 13 -

not need to unanimously agree as to how Defendant executed the scheme, a result fundamentally at odds with the Sixth Amendment.

*Second*, it smuggles otherwise time-barred conduct into an already charged count. The Government concedes that four of the 20 covered securities—CHGG (March 22, 2019), FLT (June 6, 2019), MCK (September 27, 2019), and LOPE (January 28, 2020)—predate the six-year statute of limitations measured from the February 4, 2026 FSI. The Government claims they can do this because these new securities are all part of one scheme. But each execution of the scheme—all four securities are separate executions—must be charged separately, and here, they were not. Had the Government charged properly,  these four counts would be time-barred. The duplicity doctrine exists to prevent this kind of temporal manipulation.

*Third*, this charging decision has allowed the Government to lard the FSI with prejudicial, irrelevant evidence such as Mr. Left's deletion of his Twitter account years after his securities trading. The Government's argument that it may do so because all this is included in the general "scheme" count demonstrates why Count One must be dismissed. The Government does not dispute that these acts are not independent executions of the scheme, that they had no connection to covered securities, or that many of these acts took place years after the trading in the actual covered securities. By improperly elongating the scheme and divorcing the "in connection with" requirement from the actual acts, this evidence suddenly, in the Government's eyes, becomes admissible. This extreme prejudice would not be allowed had the Government properly charged each scheme execution separately.

## II.    The Indictment Fails to Allege a Cognizable Fraud Theory.

### A.    The Government Does Not Address the FSI's Repeated Use of the Word "Conceal," Which Is an Omissions-Based Theory of Fraud.

The Government contends the defense's "omissions" theory of fraud is wrong because the FSI does not use the word "omission." Opp. 16. That is correct, but the

- 14 -

FSI does consistently use (and Defendant's Motion cited these paragraphs) the word "*conceal*"—a synonym that forms the backbone for the Government's charges. The FSI alleges, at length, that Mr. Left *concealed* his relationships with hedge funds, his own private trading, and his trading intentions. Dkt. 185 at 17–18. It is illogical to suggest the FSI does not rely on an omissions theory because the Government chose to use the word "conceal" instead of "omission."

Regardless, by failing to even respond to the defense's concealment argument, the Government has conceded it. Thus, all allegations premised on Mr. Left's alleged concealment of information, including the concealment of financial relationships with hedge funds, must be dismissed.

### B.    The Government Cannot Re-Label Statements as Being False and Misleading to Evade an Omissions Theory of Fraud.

The Government argues the defense's "omissions" argument is wrong because the Government labels the statements alleged in the FSI as "false and misleading." But the Government cannot plead around its omissions theory by slapping a "false and misleading" label on conduct that is omissions-based. Consider the Government's own examples:

*NVDA*: Mr. Left tweeted his opinion that he saw Nvidia hitting $165 rather than retreating to $120 (it was then trading in the low $140s). FSI ¶¶43–44. The Government claims the statement was "false and misleading when made" (Opp. 17), but does not explain how selling stock two hours later at a price well *above* what it was then trading at could render an earlier statement false and misleading. Even if Mr. Left *did* possess an intent to sell when he made the tweet—"When a defendant predicts $165 while simultaneously planning to dump his entire position at $150" (Opp. 18)—the Government does not explain how that intent to sell would render an *opinion* as to a future price to be false and misleading. Mr. Left was not promising to hold his full position until it hit that price. He was, like thousands of others, opining

that he believed the stock was oversold and would trend higher; his statement had nothing to do with his future trading intentions. The "fraud" exists only if Mr. Left was obligated to disclose his trading hours after his public statement. This is an omissions theory.[5]

*NVTA*: The FSI claims Mr. Left on July 17, 2019, sent an investor letter stating his fund would "continue to add to our position at our current levels," and beginning the next day (and continuing through the next week), he sold off some shares while maintaining a long position. FSI ¶¶99–100. Again, the Government does not explain how this statement was false and misleading "when made." There are no allegations the stock remained at "current levels" such that Mr. Left would keep buying shares. In addition, selling some stock does not render false the statement that Citron would "continue to stay long until the stock hits at least $65." FSI ¶104. "Staying long" implies the ownership of at least one share of stock; it does *not* mean that a person would hold every single share of his current position until the stock hit $65.

*GE*: Mr. Left described GE stock as an "opportunity to buy" (FSI ¶110), which the Government believes was false when made because he had already placed a sell order. Opp. 17. But he *did* purchase stock; that wasn't rendered false and misleading by the fact that he placed a limit order to potentially sell stock in the future. It was unknown at that time if the sale would even go through. Moreover, Mr. Left's statement regarding GE about his own personal receipt of compensation "to publish research" (FSI ¶111(b)), to the extent it was important to anyone (it was not), was not

---

[5] The Government's portrayal of Mr. Left's actions regarding Nvidia—a now multi-trillion dollar stock—is absurd. He did not engage in a pump-and-dump, nor lie. The stock was trading at over $140 when he tweeted. It continued rising through the morning. Only after it had risen another $10 (a massive move for a macro-cap stock) did Mr. Left sell his position. That he prophesied, correctly, that the stock would go to $165 before retreated to $120 did not, under any honest reading of his tweet, obligate him to hold it to $165. If that were the case, every investment bank that issues research reports with future price targets would be committing securities fraud on a massive scale every day of the week by trading in and out of those stocks.

false and misleading. The money he received from those two hedge funds, as the Government is aware, was not for publishing research.

*CRON*: No federal indictment has ever been brought because an individual, after publishing an accurate report describing an overvalued company (CRON), opined that he covered a unspecified "small size" when in fact he covered 60% of his pre-tweet positions. FSI ¶26. Small size relative to what—the size of his CRON position or his total portfolio? Would Mr. Left not have been indicted if he used the word "some" instead of "small size"? Or if he used the word "portion" instead of "small size"? The fact that Mr. Left has been indicted because he *opined* (during a live TV interview) about the size of his cover—and not the truth of his statements regarding CRON—indicates this is a case in search of a crime.

In short, despite the Government's spin, these were not "affirmative misrepresentations about defendant's trading positions, intentions, and financial relationships." Opp. 17. These were opinions, statements of future plans if the stock stayed at current levels, and price projections. For an opinion to be actionable, the Government must allege the defendant did not hold the belief he expressed when the statement was made. *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 186 (2015). When the only evidence the Government can come up with is Mr. Left's future trading (hours, days, or weeks after his statements), that is an omissions-based fraud theory.

### C.   The Government's Reliance on the Half-Truth Doctrine Is Improper.

The defense does not dispute that material "half-truths" can form the basis of a charge under Rule 10b-5. *See Macquarie Infrastructure Corp. v. Moab Partners*, 601 U.S. 257, 258 (2024) (half-truths under 10b-5 "requires identifying affirmative assertions (*i.e.*, 'statements made') before determining if other facts are needed to make those statements 'not misleading'").

- 17 -

However, what the Opposition characterizes as half-truths are *not* half-truths. Half-truths are not created because a defendant fails to disclose a particular fact, even if a person would have wanted to know that fact. Instead, as the Second Circuit recognized in *United States v. Skelly* when considering a broker's failure to disclose additional compensation to customers: "Because a registered representative is under no inherent duty to reveal his compensation, otherwise truthful statements made by him about the merits of a particular investment are not transformed into misleading 'half-truths' simply by the broker's failure to reveal that he is receiving added compensation for promoting a particular investment." 442 F.3d 94, 97 (2d Cir. 2006). The Court rejected the very same argument the Government is now making. Without a duty to disclose (absent from the Government's case), Mr. Left's failure to publicize on Twitter his future stock sales or intent to sell did not transform his otherwise truthful tweets into misleading "half-truths."

The Government, in attempting to distinguish *Skelly*, claims the FSI is not premised on Defendant's "fail[ure] to reveal undisclosed compensation," but his "affirmatively false statement about his financial incentives." Opp. 20. But that distinction collapses on inspection: here too, the Government alleges Mr. Left's statements were rendered misleading by *undisclosed* information—*i.e.*, his trading intentions and relationships with hedge funds. The comparison is apt, and *Skelly*'s holding—no "half-truths" liability absent disclosure obligations—applies. Failing to provide real-time updates on Twitter about one's trading does not turn truthful information about the stocks into misleading half-truths absent a duty to disclose.[6]

Moreover, the two examples the Government provides to justify its position here—that Mr. Left told "CNBC viewers that he covered a 'small size' of his CRON

---

[6] As described in the defense's grand jury transcripts motion, the Government's reliance on *Zweig v. Hearst Corp.*, 594 F.2d 1261 (9th Cir. 1979)—a penny-stock case—to distinguish *Skelly* is nonsensical. *See* Dkt. 202 at 10.

position" and he "tweeted that Citron was 'shorting with a $20 2020 target' for PLTR while planning to close his positions within minutes"—make little sense. Opp. 19. The first statement is an immaterial opinion on the size of his short cover, and the second statement is accurate. He *was* shorting PLTR at the time, and, as alleged, he did not fully close his position until November 30, 2020, three days later. FSI ¶84. The Government's true gripe is that he did not fully disclose that he stood to gain from covering his short in the future. But without any duty to reveal this information, this is the same argument rejected in *Skelly*. Strip away the Government's nomenclature, and what remains is that Mr. Left was obligated to disclose his trading intentions every time he published a market opinion. That is a duty-to-disclose theory; rebranding it as "half-truths" is a labeling change, not a substantive one.

The Government's reliance on *SEC v. Capital Gains Rsch. Bureau, Inc.*, 375 U.S. 180, 196–98 (1963), confirms the Government's error. The defendant in *Capital Gains* was duty-bound to make "full and frank disclosures" of "his practice of trading on the effect of his recommendations" because, under the Investment Advisors Act of 1940, he was a *financial advisor*. The court grounded his duty in the fiduciary relationship created by that law: "The Investment Advisers Act of 1940 … reflects a congressional recognition of the delicate fiduciary nature of an investment advisory relationship." *Id.* at 191–92. Mr. Left was not a registered investment adviser. The Investment Advisers Act does not apply to him. *Capital Gains* does not create a free-floating duty for market commentators.

The Government further protests that "*Chiarella* has nothing to say about a defendant who *affirmatively speaks* and makes false or half-true statements." Opp. 20. But this misses the point. Mr. Left's alleged statements—price targets, position descriptions, buy/sell recommendations—are market opinions. The Government alleges these opinions were misleading because Mr. Left simultaneously held

- 19 -

undisclosed contrary trading intentions. That is not an affirmative misrepresentation—it is an omission of context that, according to the Government, Mr. Left was obligated to provide. The question of whether he was so obligated is the precise question that *Chiarella* answers.

Finally, the Government cites *United States v. Laurienti*, 611 F.3d 530, 541 (9th Cir. 2010), for the proposition that "even in the absence of a trust relationship," a defendant "cannot affirmatively tell a misleading half-truth about a material fact to a potential investor." Opp. 19. But *Laurienti* involved a CEO who made affirmative misrepresentations about his company's financial condition to investors who were purchasing stock. 611 F.3d at 535–36. The defendant in *Laurienti* was a corporate insider soliciting investment, not a third-party market commentator publishing opinions on a blog. *Laurienti* does not eliminate the duty requirement; it holds that the duty can arise from the act of affirmatively misleading someone in connection with a transaction. Here, Mr. Left's publications only become misleading when an obligation to disclose trading activity is superimposed. That is inconsistent with the law.

### D.    The Government's Reliance on *Mahaffy* and Its Progeny Is Misplaced.

The Government argues the omissions debate is "beside the point" because §1348's "scheme to defraud" language is so broad that neither affirmative misrepresentations nor omissions with a duty to disclose are needed. Opp. 22. But the Government's own description of the "deceptive" scheme to defraud refutes this argument.

The Government defines the "deceptive" scheme as "acquiring positions, recommending them *without disclosing an intent to trade in the opposite direction*, and selling for personal benefit." *Id.* That is, plain and simple, an omissions theory.

1  The Government cannot describe its fraud as "without disclosing"—*i.e.*, concealing
2  or omitting—and simultaneously argue that disclosure obligations are irrelevant.

3      Regardless, even accepting the Government's argument (to be clear, the
4  defense does not, *see* Dkt. 185 at 19–21), §1348's "scheme to defraud" still requires
5  criminal deception. *See Neder v. United States*, 527 U.S. 1, 24–25 (1999). The
6  question is not whether the Government must prove a specific false statement, but
7  whether it must identify what made conduct deceptive. Here, the Government's own
8  answer is nondisclosure. That answer triggers the "duty" requirement of *Chiarella v.*
9  *United States*, 445 U.S. 222, 235 (1980). Now, recognizing that there is no such duty,
10 the Government attempts to plead around the requirement by styling the scheme as
11 one of "deception." But this attempt to re-label a disclosure requirement as affirmative
12 "deceptive" conduct runs afoul of the well-settled rule that indictments based on
13 omissions or concealment theories *must* plead an affirmative duty to disclose. *See,*
14 *e.g.*, *United States v. Lonich*, 2016 WL 324039, *8 (N.D. Cal. 2016) (collecting
15 cases).

16      The Government knows the defense is correct, which is why it spent five pages
17 of its Opposition detailing the specific statements it claims were false and misleading
18 or half-truths. Opp. 16–21. If §1348 required nothing more than a "scheme," the
19 Government would not need those examples. It needs them because it must prove
20 criminal deception, and the deception the Government itself identifies is Mr. Left's
21 alleged failure to disclose his trading intentions alongside his published opinions.

22      The Government's reliance on *Mahaffy* only underscores the point. In *United*
23 *States v. Mahaffy*, the defendants were securities professionals who owed fiduciary
24 duties to their customers and exploited that relationship by frontrunning customer
25 orders. 693 F.3d 113, 125 (2d Cir. 2012). There was no question about the source of
26 the duty. Here, Mr. Left is a third-party commentator with no fiduciary relationship

27
28

2:24-cr-00456-VAP
REPLY IN SUPPORT OF MOTION TO DISMISS, IN PART, THE FIRST SUPERSEDING INDICTMENT

to anyone who reads his tweets. The Government has never explained what duty Mr. Left owed, to whom, or why. Without that foundation, "scheme to defraud" is just a label, not a properly charged crime.

Nor can the Government escape the common-law meaning of fraud. As *Neder*, 527 U.S. at 22–25, made clear, Congress legislates against the common-law backdrop of fraud, which requires a misrepresentation or concealment of material fact. The Government cannot invoke §1348's "breadth" to dispense with elements the Supreme Court has read into the statute's operative terms. And to the extent ambiguity remains, the rule of lenity requires it be resolved in Mr. Left's favor. *Santos*, 553 U.S. at 514.

## <u>CONCLUSION</u>

For these reasons, the Court should dismiss: (1) Count One; and (2) all other counts to the extent premised on an omissions-based theory of fraud.


Dated: March 13, 2026                    Respectfully submitted,

                                         DYNAMIS LLP

                                         */s/ Eric S. Rosen*
                                         Eric S. Rosen (*pro hac vice*)
                                         Michael B. Homer (*pro hac vice*)
                                         Yusef Al-Jarani
                                         Aaron Katz (*pro hac vice*)

                                         *Attorneys for Defendant Andrew Left*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **CERTIFICATE OF COMPLIANCE**

I certify, as counsel for Defendant Andrew Left, that this memorandum of points and authorities contains 6,979 words, which complies with the word limit of L.R. 11-6.1.

Dated: March 13, 2026                    */s/ Yusef Al-Jarani*
                                          Yusef Al-Jarani