TODD BLANCHE
Acting Attorney General
BILAL A. ESSAYLI
First Assistant United States Attorney
ALEXANDER B. SCHWAB (Cal. Bar No. 283421)
Assistant United States Attorney
Acting Chief, Criminal Division
BENEDETTO L. BALDING (Cal. Bar No. 244508)
ANDREW M. ROACH (Cal. Bar No. 293375)
Assistant United States Attorneys
LORINDA I. LARYEA
Chief, Fraud Section
LAUREN ARCHER
Senior Counsel
MATTHEW REILLY
Acting Assistant Chief
Criminal Division, Fraud Section
          1200/1100 United States Courthouse
          312 North Spring Street
          Los Angeles, California 90012
          Telephone: (213) 894-1259/2274
          E-mail:  alexander.schwab@usdoj.gov
                   benedetto.balding@usdoj.gov
                   andrew.roach@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

                    UNITED STATES DISTRICT COURT

               FOR THE CENTRAL DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,            No. 2:24-cr-00456-VAP

            Plaintiff,               GOVERNMENT'S REPLY IN SUPPORT OF
                                     MOTION IN LIMINE NO. 1 TO EXCLUDE
                 v.                  AFTER-THE-FACT EVIDENCE IRRELEVANT
                                     TO THE CHARGED CONDUCT
ANDREW LEFT,
                                     Hearing Date: April 27, 2026
            Defendant.               Hearing Time: 10:00 AM

     The United States of America, by and through its counsel of

record, the First Assistant United States Attorney for the Central

District of California, the Chief of the Fraud Section of the

Criminal Division of the U.S. Department of Justice, Assistant United

States Attorneys Alexander B. Schwab, Benedetto Balding, and Andrew

i

Roach and Senior Counsel Lauren Archer and Acting Assistant Chief Matthew Reilly, hereby files its reply in support of the government's motion in limine to exclude after-the-fact evidence.

This reply is based upon the attached memorandum of points and authorities, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: April 10, 2026          Respectfully submitted,

TODD BLANCHE
Acting Attorney General

BILAL A. ESSAYLI
First Assistant
United States Attorney

LORINDA I. LARYEA
Chief, Fraud Section
Criminal Division

    /s/
BENEDETTO L. BALDING
ALEXANDER B. SCHWAB
ANDREW M. ROACH
MATTHEW REILLY
LAUREN ARCHER

Attorneys for Plaintiff
UNITED STATES OF AMERICA

ii

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

**I.    INTRODUCTION**

The government does not seek to preclude defendant from presenting a good faith defense, but rather, to keep it tethered to the relevant element – what defendant knew and believed at the time he made the charged statements. After-the-fact evidence (i.e., the issuer's stock price two years later) could not have shaped what defendant knew or believed at the time the crime was committed.  Such evidence is inadmissible because it does not tend to make any fact of consequence more or less probable.[1]

Defendant's opposition confirms precisely why after-the-fact evidence should be excluded. Stripped of its rhetoric, defendant's opposition advances a single thesis: because some of defendant's predictions eventually came true, he must have sincerely believed them and therefore could not have intended to deceive. Such failed logic intentionally confuses the issues before the jury – conflating the question of whether defendant's predictions (somehow, at any time) became accurate with the relevant question of whether he intended to deceive investors about a short-term scalping scheme. Moreover, the vast scope of after-the-fact evidence defendant seeks to admit would transform this trial from a focused inquiry into defendant's contemporaneous intent into a years-long retrospective on the merits of Citron Research and the multi-year journeys of twenty public company stocks. Any minimal probative value of this after-the-fact evidence is substantially outweighed by the danger of confusing

---

[1] The government recognizes that evidence that was known to defendant *at the time* he published each charged tweet or report, such that it could have actually informed defendant's state of mind when he made the statement, is potentially admissible to argue good faith.

1

the issues and wasting time, and for that reason, such evidence should be precluded.

**II.   ARGUMENT**

   **A.   THE COURT'S PRIOR RULING DOES NOT FORECLOSE THIS MOTION**

Defendant's opposition leads with the Court's Order on the cross-motions to exclude experts, arguing that the Court has already made up its mind, finding that after-the-fact evidence is wholesale relevant. ECF No. 249, (Opp. at 3 (citing ECF No. 234 at 13)).[2] That ruling addressed the evidentiary question in a different procedural posture and with incomplete information. At that time, defendant had not disclosed the specific time periods, securities tickers, and prices that Professor Verstein would testify to. Id. at 14 (ordering defendant to disclose time periods and price data). Defendant's position that he need not identify the post-report stock prices he intends to offer because the evidence may come through lay witnesses (Opp. at 17) sidesteps the Court's Order. Id. Should the Court find such evidence more broadly admissible, the government respectfully renews its request that defendant be required to disclose the actual information he intends to offer at trial. With that information, the Court can consider the concrete trial management consequences that were not squarely presented earlier and apply Rule 403 with the full trial picture in view.

Defendant's subsequent actions have revealed the overbroad and unconstrained approach he intends to pursue at trial. On April 1,

---

[2] The Court denied the government's motion to exclude Professor Verstein's testimony regarding irrelevant stock price data for the subject securities that is well outside the pertinent time period, agreeing with defendant that "such data is probative of defendant's intent because it bears on whether he genuinely believed in the truth of his alleged public statements regarding the subject securities."

2026, defendant served the government with a chart listing defendant's proposed Dates of Analysis for each of the tickers for which he proposes to introduce subsequent stock movement. See Ex. 1. The proposed time periods include ranges ending in 2020, the end of 2021, the end of 2023, the end of 2025, and even up to and including the present. Id. This is for 21 tickers. The accompanying underlying data files contained 77 excel files of market data that defendant presumably intends to introduce. This extended timeline underscores that defendant's proposed after-the-fact evidence is as attenuated and distant as the government anticipated, and the Court must closely guard against an undue waste of time and sideshows. Even if the Court deems certain after-the-fact stock price data to be admissible, certainly seven to eight years of such data raises significant Rule 403 concerns and, at a minimum, defendant's evidence on this front must be limited to that having a plausible connection to the time of his public statements.

### B.    ACCURACY HAS NO BEARING ON THE CHARGED DECEPTION

Defendant's core argument collapses two separate questions. The first is whether defendant held a sincere view about where a stock would eventually trade. The second — the only one the jury must decide — is whether defendant concealed from investors his plan to immediately exit his publicly stated positions. Those two things are not in tension because defendant could simultaneously hold a long-term view of a particular stock and still execute a deceptive short-term scalping scheme. Defendant's own framing concedes the fraud theory turns on deception related to his trading intentions, yet insists that the jury must hear years of untethered price data to evaluate whether his analyses were accurate.

3

To be clear, defendant is free to introduce evidence of his "extensive efforts to provide accurate information to the market," (Opp. at 9), through his contemporaneous research files, analysis of target prices, communications reflecting his work or views, public information available to him at the time, and his own testimony. What should be excluded is evidence that postdates the charged conduct and could not have informed defendant's contemporaneous mental state — stock prices from years later, regulatory settlements he could not have known about, and uncharged transactions offered to negate intent through propensity reasoning. The line between admissible and inadmissible good-faith evidence is the line between what was in defendant's head on the day he tweeted and what came into existence afterward.  See SEC v. Gallagher, No. 21-CV-8739 (PKC), 2023 WL 6276688, at *9 (S.D.N.Y. Sept. 26, 2023) ("The Court agrees with the SEC that 'the deceit of investors occurs, and is complete, upon the dissemination of the false or misleading touts,' without regard to whether those touts later cause a rise in share price or sales volume."). This case is not about the ultimate accuracy, or quality, of defendant's work product. The FSI's allegation that "*defendant Left concealed* the contributions of third parties, including hedge funds, in the preparation of Citron's commentary," FSI ¶ 19(e)(i), is not a critique of "the quality" of defendant's research as his opposition states. (Opp. at 2 (omitting the three key words italicized here).) To the contrary, it is an allegation that defendant's public statements about his independence were false. See also FSI ¶ 111-112. ("Markopolos 'is being paid a % of profits from an unnamed hedge fund that is short GE,' which had been the subject

4

of a recent short report by Harry Markopolos.  'No credible hedge fund or short seller would ever do this.'").

Likewise, the FSI's references to "extreme and inflammatory" target prices, FSI ¶ 19(e)(iv), allege that defendant deployed those prices as tools to maximize short-term impact — not that the numbers were analytically indefensible. With that clarification, defendant's asserted need to rebut the FSI's characterizations evaporates. (Opp. at 1-2, 13-14.) Defendant's PTE example illustrates the problem rather than solving it. (Opp. at 6.) Defendant picks today's sub-$1 price to validate a tweet published nearly eight years ago, while ignoring every intervening data point. That is precisely the cherry-picking the government's motion identified, (Mot. at 10), and it previews the satellite disputes Rule 403 forbids. Moreover, in many instances, the government can just as easily pick a different after-the-fact stock price from a different point in time to make the contrary point that defendant's opinion was inaccurate.  This is the sideshow that defendant's approach invites.

### C.    ZWEIG REMAINS GOOD LAW ON SCALPING

Defendant's extended attack on Zweig v. Hearst Corp. significantly overstates his case. 594 F.2d 1261 (9th Cir. 1979), abrogated on other grounds by Hollinger v. Titan Cap. Corp., 914 F.2d 1564 (9th Cir. 1990); (Opp. at 6-9.)[3] To begin, Chiarella v. United States, 445 U.S. 222 (1980), concerned tippee liability in an insider-trading context and did not disturb the requirement of those who choose to speak publicly, to speak truthfully.

---

[3] Defendant's reference to Skilling v. United States, 561 U.S. 358 (2010) is misplaced. Skilling addressed honest-services fraud under § 1346 and has no bearing on § 1348 or § 10(b) scalping liability.

Notably, post-Chiarella, district courts around the country have cited Zweig in similar scalping cases. See SEC v. Wall Street Pub. Inst., 851 F.2d 365, 375 n.13 (D.C. Cir. 1988)(citing Zweig and SEC v. Blavin, 760 F.2d 706 (6th Cir. 1985), as cases where "journalists engaged in scalping, the burden of regulation fell *not directly on the content of the publications* but rather on the stock transactions engaged in by the journalist around the time of publication") (emphasis added) ; SEC v. Park, 99 F. Supp. 2d 889 (N.D. Ill. 2000); SEC v. Thompson, 238 F. Supp. 3d 575 (S.D.N.Y. 2017); United States v. Cannistraro, 800 F. Supp 30, 84 (D.N.J. 1992)(relying on Zweig in denying motion to dismiss indictment)(finding in a criminal case "[t]he extent of the Defendants' financial interest in the recommended securities and their purpose of holding those securities would certainly be viewed as material by the investing public. The Defendants purchased the securities only to profit from the rise in price as a result of the dissemination of the research reports; the investing public, however, purchased the securities for long term purposes. Had the investing public been apprised that the Defendants intended to sell their securities after an increase in price, they most likely would not have purchased the stock."). It is undisputable that Zweig's finding that the deceptive failure to disclose a commentator's intent to trade against his published view remains a basis for scalping liability under the federal securities laws.

Notably, the Ninth Circuit also continues to cite Zweig as good law. See SEC v. Franklin, 265 F. App'x 644, 647 (9th Cir. 2008)(citing Zweig and holding "the law prohibits 'the activities of one who uses a column as part of a scheme to manipulate the market and deceive the investing public'"); see also United States v. Sayre,

434 F. App'x 622, 623 n.2 (9th Cir. 2011) ("The Zweig materiality definition remains good law.") Defendant ignores this.

Defendant's related argument that "everyone knew" he was an activist short seller with positions, (Opp. at 8), misses the point. General awareness that Citron took positions is not the same as disclosure that defendant planned to immediately reverse course and close out within hours of publication. The FSI alleges concealment of that specific trading plan — not a failure to disclose that defendant traded at all. FSI ¶ 19(e).

Finally, the footnotes in Hollinger v. Titan Cap. Corp., 914 F.2d 1564, 1570 nn.9-10 (9th Cir. 1990) regarding the flexible duty test, did not eliminate liability for scalping. See SEC v. Beck, Case No. 2:22-cv-00812-FWS-JC, 2024 WL 1626280, at *6 (C.D. Cal. Mar. 26, 2024) (citing Lowe v. SEC, 472 U.S. 181, 224 (1985) (White, J. concurring) as describing "scalping" as "conduct in which a person associated with an advisory service purchas[es] shares of a security for his own account shortly before recommending that security for long-term investment and then immediately sell[s] the shares at a profit upon the rise in the market price following the recommendation.") (quoting SEC v. Cap. Gains Rsch. Bureau, Inc., 375 U.S. 180, 181 (1963)(internal quotes removed)).

### D.   THE OMNICARE MATERIALITY ARGUMENT DOES NOT SALVAGE AFTER-THE-FACT EVIDENCE

Defendant repackages accuracy evidence as bearing on materiality rather than intent, arguing the jury must assess the "total mix" of information under Omnicare. (Opp. at 5-6.) Materiality in a scalping case is assessed from the perspective of a reasonable investor receiving the commentary **at the time it was published** — not with the

7

benefit of years of hindsight. See Beck, 2024 WL 1626280, at *6-7 (collecting scalping cases discussing materiality). A reasonable investor reading defendant's November 2020 PLTR tweet could not have known where PLTR would trade in 2023 (or at its heights today), and that information was not part of the "total mix" available to the market then. Omnicare does not license the admission of post-publication developments that no contemporaneous investor could have known or considered.

### E.    UNCHARGED TRADING EVIDENCE REMAINS INADMISSIBLE

Defendant recasts his uncharged trading evidence as proof of "regular practice" rather than "good acts." (Opp. at 9-10.) The relabeling does not change the inferential chain: I traded this way on uncharged occasions; therefore, I lacked deceptive intent on the charged ones. That is classic propensity reasoning. Defendant's argument that the government's expert Ross Waller "opened the door" to evidence of uncharged trading, (Opp. at 11), misses the mark. Waller's analysis addresses the *charged* trading. Defendant may make his "cherry-picking" argument, (Opp. at 11), on cross-examination, but that does not entitle defendant to introduce unrelated, uncharged trading as evidence of innocent intent.

Moreover, defendant's trading "with respect to companies about which he did not comment publicly," (Opp. at 10), is wholly irrelevant and improper evidence of other "good acts." Securities laws do not ban scalping; they regulate it through disclosure. See SEC v. Thompson, 238 F. Supp. 3d 575, 590 (S.D.N.Y. 2017)("Scalping is permitted, provided the individual with the vested interest in the stock discloses the extent of his financial stake in the subject securities."). The allegations in this case stem from defendant's

8

choice to speak publicly about targeted securities, triggering his obligation to speak truthfully and disclose material information. His trading in securities about which he did not speak publicly is irrelevant to any fact of consequence in this case and would confuse the issues before the jury.

### F.    RULE 403 CONCERNS ARE CONCRETE, NOT SPECULATIVE

The extensive "after-the-fact" evidence sought by defendant will confuse the issues, risk misleading the jury, and substantially waste time. Defendant's assurance that stock-price evidence is simple — a comparison of two numbers — is belied by his own brief, which acknowledges that intervening market forces, company developments, and macroeconomic factors as fair game for argument. (Opp. at 15-16.) Multiplied across the twenty-one securities, each with its own post-report price history, the result is exactly the trial-within-a-trial Rule 403 stands to limit. Defendant's proposed "summary data" on uncharged trading, (Opp. at 12), compounds rather than cures the problem. He wants a trial on everything he has ever traded, not the trades that are charged as crimes. At a minimum, now that defendant has revealed the extensive and untethered scope of the after-the-fact stock price evidence, the Court should curb defendant and require some an actual connection to his statements about the securities.

Defendant's invocation of Haischer, (Opp. at 13), does not change this calculus. United States v. Haischer, 780 F.3d 1277, 1284 (9th Cir. 2015) (holding an evidentiary error violates a defendant's due process rights when it excludes: "(1) the main piece of evidence, (2) for the defendant's main defense, to (3) a critical element of the government's case")(quoting United States v. Evans, 728 F.3d 953, 967 (9th Cir. 2013). Haischer involved exclusion under Rule 403 of

evidence of physical abuse *contemporaneous* with the charged conduct, which the court found "strongly supported" defendant's primary defense of duress in signing fraudulent loan documents. Id. 780 F.3d at 1281-83. Here, by contrast, the excluded evidence concerns events defendant did not and could not have known about when he published the charged reports and traded — events that, by definition, could not have affected his contemporaneous mental state. Due process does not require admission of evidence that has no bearing on the question the jury must decide.

###    G.    THE SCHEME-PERIOD ARGUMENT CONFLATES TWO TIMEFRAMES

Finally, defendant argues that evidence from within the charged scheme period cannot be "after-the-fact." (Opp. at 14.) The argument conflates the duration of the overall scheme with the completion of deceptive acts as to each individual security. With any given Targeted Security, the relevant deception was complete when defendant published his misleading commentary and nearly immediately closed his contrary position. FSI ¶ 84. Price movements weeks or months later, even within the broader scheme window, post-date the relevant fraudulent acts with regard to that security. Undoubtedly, the scheme continued and defendant moved on to further his scheme with other tickers and concealment efforts.  However, that does not mean that later stock price movements for these tickers (unrelated to any aspect of the scheme) is relevant to defendant's mental state at the time he engaged in deceptive conduct.

## III. CONCLUSION

For these reasons, the government's motion in limine to preclude defendant from introducing after-the-fact evidence should be granted.

**CERTIFICATE OF COMPLIANCE**

The undersigned, counsel for the United States, certifies this memorandum of points and authorities complies with the word limit of L.R. 11-6.1.

Dated: April 10, 2026

_____/s/_____
Matthew Reilly
Acting Assistant Chief

11