TODD BLANCHE
Acting Attorney General
BILAL A. ESSAYLI
First Assistant United States Attorney
JENNIFER L. WAIER
Chief Assistant United States Attorney
Chief, Criminal Division
BENEDETTO L. BALDING (Cal. Bar No. 244508)
ANDREW M. ROACH (Cal. Bar No. 293375)
Assistant United States Attorneys
LORINDA I. LARYEA
Chief, Fraud Section
MATTHEW REILLY
Acting Assistant Chief
Criminal Division, Fraud Section
    1200/1100 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-2274/0306
    E-mail:  benedetto.balding@usdoj.gov
            andrew.roach@usdoj.gov
            matthew.reilly2@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. 2:24-CR-456-VAP |
|---|---|
| Plaintiff, | GOVERNMENT'S OPPOSITION TO DEFENDANT ANDREW LEFT'S MOTION IN LIMINE TO EXCLUDE INADMISSIBLE TESTIMONY AND ARGUMENT |
| v. | |
| ANDREW LEFT, | |
| Defendant. | |

Plaintiff United States of America, by and through its counsel of record, the First Assistant United States Attorney for the Central District of California and Assistant United States Attorneys Benedetto L. Balding and Andrew M. Roach, and Acting Assistant Chief Matthew Reilly, hereby files its Opposition to Defendant Andrew Left's Motion in Limine to Exclude Inadmissible Testimony and Argument.

This opposition is based upon the attached memorandum of points and authorities, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: May 5, 2026                    Respectfully submitted,

                                      TODD BLANCHE
                                      Acting Attorney General

                                      BILAL A. ESSAYLI
                                      First Assistant United States
                                      Attorney

                                      JENNIFER L. WAIER
                                      Chief Assistant United States
                                      Attorney
                                      Chief, Criminal Division


                                      _____/s/_____
                                      BENEDETTO L. BALDING
                                      ANDREW M. ROACH
                                      MATTHEW REILLY

                                      Attorneys for Plaintiff
                                      UNITED STATES OF AMERICA

**TABLE OF CONTENTS**

DESCRIPTION                                                              PAGE


TABLE OF AUTHORITIES..................................................ii

MEMORANDUM OF POINTS AND AUTHORITIES..................................1

I.    INTRODUCTION....................................................1

II.   ARGUMENT........................................................1

      A.    The Testimony of Retail Investors, Company Executives,
            and Stock Analysts is Admissible Based on Their
            Percipient Knowledge and Lay Opinion.....................1

      B.    The Government Should be Permitted to Introduce
            Evidence About the Accuracy of Defendant's Reports and
            Statements..............................................11

            1.    The FSI Charges that the Reports Were False and
                  Misleading........................................13

            2.    Defendant Has Opened the Door to Evidence of
                  Inaccuracies in the Reports.......................17

            3.    The Evidence is Plainly Relevant..................18

            4.    There is No Risk of a Fatal Variance..............20

            5.    There is No Prejudice.............................23

III. CONCLUSION......................................................25

**TABLE OF AUTHORITIES**

DESCRIPTION                                                                    PAGE

Cases

Basic, Inc. v. Levinson,
  485 U.S. 224 (1988) ............................................... 2

City of Dearborn Heights v. Align Tech., Inc.,
  856 F.3d 605 (9th Cir. 2017) ..................................... 19

Lincoln v. Sunn,
  807 F.2d 805 (9th Cir. 1987) ..................................... 25

Old Chief v. United States,
  519 U.S. 172 (1997) .............................................. 11

Omnicare,Inc. v. Laborers Dist. Council Construction Ind. Pen. Fund,
  575 U.S. 175 (2015) ........................................... 18, 19

SEC v. Rana Rsch., Inc.,
  8 F.3d 1358 (9th Cir. 1993) ....................................... 9

SEC v. Davis,
  No. 2:20-CV-03271-SB-KS,
  2022 WL 3575769 (C.D. Cal. June 23, 2022) ........................ 8

SEC v. Talbot,
  530 F.3d 1085 (9th Cir. 2008) ..................................... 2

SEC v. Ustian,
  No. 16-C-3885, 2020 U.S. Dist. LEXIS 14092 (N.D. Ill. Jan. 26,
  2020) ............................................................ 8

United States v. Adamson,
  291 F.3d 606 (9th Cir. 2022) .................................. 21, 22

United States v. Begnaud,
  783 F.2d 144 (8th Cir. 1986) ..................................... 15

United States v. Beltran-Rios,
  878 F.2d 1208 (9th Cir. 1989) .................................... 18

United States v. Bhagat,
  436 F.3d 1140 (9th Cir. 2006) ................................. 12, 22

United States v. Bush,
  626 F.3d 527 (9th Cir. 2010) ..................................... 21

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                                                                                                              PAGE

United States v. Cuti,
    720 F.3d 453 (2d Cir. 2013) ........................................ 9

United States v. Decker,
    624 F. App'x 959 (9th Cir. 2015) ................................. 20

United States v. Falsia,
    724 F.2d 1339 (9th Cir. 1983) .................................... 18

United States v. Ferguson,
    No.CRIM 3:06CR137 CFD,
    2007 WL 4556625 (D. Conn. Dec. 20, 2007) ...................... 7, 26

United States v. Forbes,
    Case No. 02-cv-264-AHM,
    2006 WL 8423075 (D. Conn. Sept. 21, 2006) ........................ 7

United States v. Eddings,
    No. 2:09-CR-00074 JAM,
    2011 WL 5838231 (E.D. Cal. Nov. 21, 2011) ....................... 21

United States v. Giese,
    597 F.2d 1170 (9th Cir. 1979) .................................... 17

United States v. Hatfield,
    724 F. Supp. 2d 321 (E.D.N.Y. 2010) .............................. 7

United States v. Jennings,
    487 F.3d 564 (8th Cir. 2007) ...................................... 9

United States v. Kahan & Lessin Co.,
    695 F.2d 1122 (9th Cir. 1982) .................................... 22

United States v. Kellogg,
    510 F.3d 188 (3d Cir. 2007) ....................................... 9

United States v. Laurienti,
    611 F.3d 530 (9th Cir. 2010) ........................... 8, 9, 10, 11

United States v. Lo,
    No. 97-10305, 1998 WL 88369 (9th Cir. Feb. 11, 1998) ......... 18, 25

United States v. Moyer,
    674 F.3d 192 (3d Cir. 2012) ...................................... 17

United States v. Ryan,
    283 F. App'x 479 (9th Cir. 2008) ................................. 24

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                                                                                                                                         PAGE

United States v. Sandoval,
  2024 WL 278786 n.23 (D.N.M. Jan. 25, 2024),
  aff'd, 154 F.4th 741 (10th Cir. 2025) ............................. 24

United States v. Schiff,
  602 F.3d 152 (3d Cir. 2010) .................................. 7, 26

United States v. Shwayder,
  312 F.3d 1109 (9th Cir. 2002),
  opinion amended on denial of reh'g,
  320 F.3d 889 (9th Cir. 2003) ..................................... 10

United States v. Sullivan,
  522 F.3d 967 (9th Cir. 2008) ..................................... 16

United States v. Von Stoll,
  726 F.2d 584 (9th Cir. 1984) ..................................... 16

Yeargain v. United States,
  314 F.2d 881 (9th Cir. 1963) ..................................... 17

Zweig v. Hearst Corp.,
  594 F.2d 1261 (9th Cir. 1979) .................................... 23

Other Authorities

Ninth Cir. Model Criminal Instructions 5.1.......................... 21

Ninth Cir. Model Criminal Instructions 15.4........................ 10

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

**I.   INTRODUCTION**

Defendant's eleventh hour motion should be denied. Notwithstanding that the reports of the relevant witnesses for whom defendant now seeks to exclude a portion of their testimony were available to defendant before the motion in limine deadline, or that the government's theory of the case that defendant's scheme involved "the perception that his analyses were rigorous," and the "use of deceptive reports" for Cronos Group, Polarity, Telsa, Nvidia, Twitter, and Facebook was clearly alleged in the First Superseding Indictment ("FSI") (FSI ¶¶ 19(e)(iv), 21), defendant now moves to exclude relevant evidence on the eve of trial.  This Court should reject defendant's attempt to exclude relevant and admissible evidence and deny defendant's motion.

**II.  ARGUMENT**

> **A.   The Testimony of Retail Investors, Company Executives, and Stock Analysts is Admissible Based on Their Percipient Knowledge and Lay Opinion**

Defendant's motion assumes that the government intends to elicit everything a witness might have said that is captured in an interview memorandum.  But that is not the case.  At trial, the government intends to elicit testimony from these retail investors, company executives, and stock analysts relating to, among other things, (1) their knowledge of and witnessing of defendant's tweets and reports in the marketplace, (2) their observations of market activity before and after defendant's tweets and commentary, (3) their observations as to the effect that defendant's commentary had on the market, (4) the materiality of defendant's statements or omissions, and (5) finally, in certain circumstances, guilt-assuming questions.

All of this testimony is admissible and routinely admitted in securities fraud cases.  Such testimony involves percipient fact witnesses, and their permissible lay opinion, and goes to the heart of materiality in securities fraud cases which turn on whether "there is a substantial likelihood that a reasonable investor would consider it important in deciding whether to buy or sell securities."  SEC v. Talbot, 530 F.3d 1085, 1097 (9th Cir. 2008) (citing Basic, Inc. v. Levinson, 485 U.S. 224, 231-32 (1988)).  Of course, the hypothetical reasonable investor does not exist, so the government calls a variety of witnesses that allow the jury to make a determination as to what would have been objectively material.

While defendant spends much time in his brief arguing that the government intends to elicit everything each and every witness might have said, the truth is much simpler, as the government has explained to defense.  The government only intends to introduce admissible testimony from each witness.  It does not intend to ask them to speculate as to defendant's mental state, whether he had a duty to disclose, or judge his character.  To that end, the government intends to generally elicit the following from each of the witnesses mentioned in defendant's motion:[1]

- John Noonan (retail investor) will testify that he regularly followed financial media and was aware of Andrew Left's commentary.  (Mot., Ex. B.)  Noonan, in fact, followed defendant's public appearances and tweets to avoid

[1] This list is not exhaustive but is intended to show the general tenor of admissible evidence the government seeks to admit from each witness versus what it does not seek to admit.  The government may seek to offer additional relevant and admissible testimony from each witness and does not limit itself to merely what is provided herein.

2

holding a position targeted by one of defendant's short reports.  Noonan will also testify to his investment in ROKU, his real-time viewing of defendant's ROKU tweets on the day in question, and how he observed defendant delete his original tweet about ROKU.  Noonan will testify that he purchased ROKU stock *on the day of the tweet* in ROKU shortly before defendant issued a negative tweet alleged in the FSI, then sold shortly thereafter after the market had a quick negative reaction, causing Noonan an approximately $2,000 loss.  See Ex. 1 (Noonan 5/5/2026 Report).[2]  This is heartland testimony in a securities case.  Noonan can also offer his views as a retail investor and whether certain information would have been relevant to his decision making.  In this regard, Noonan's belief that it would have been deceptive for defendant to trade within hours of the tweet is relevant.  It demonstrates how an actual investor perceived defendant's tweet and allows the jury to assess whether a reasonable investor would have been misled by defendant's statements and conduct.  Critically, however, the government does not intend to elicit Noonan's statements about fiduciary duty or other opinions that Noonan might have regarding defendant's duties.  He is one investor who lost money because of the charged scheme and he should be permitted to testify about his experience.

---

[2] After receiving a defense trial subpoena for brokerage records, Noonan reviewed his trading records for the relevant day that refreshed his recollection that he had in fact bought just before defendant's ROKU tweet and sold at a notable loss in the ensuing market decline.

3

- Adam Gray (retail investor) will similarly testify to his own observations of defendant's commentary in the marketplace and its effect on certain stocks.  (Mot., Ex. C; see also Ex. 5 (Gray 5/4/26 Report).)  Gray will testify to his personal experience as a retail investor and how he was aware of and listened to defendant's commentary during the relevant time period.  He will testify that he assumed defendant was credible because defendant was on television talking about stocks, and that he personally called defendant around 2018 to submit a tip about another company Gray though defendant might want to know about.  Gray will discuss that, in the August 2018 time period, he was investing in the cannabis market generally and contemporaneously saw defendant's public commentary about various cannabis stocks, including Cronos.  He will testify about his review of and reaction to the Citron August 30, 2018 tweet and report on Cronos, which is one of the charged tickers in this case.  See Count 2.  He will testify to his own review of the report and his opinion regarding the allegations therein.  He will also testify about statements defendant made about Cronos and other trading related topics in a podcast on August 31, 2018.  He will offer his lay opinion as to the effect defendant's statements about Cronos and other stocks had on the marketplace.  Though Gray did not personally trade in Cronos based on defendant's August 30, 2018 statements, his testimony goes directly to the materiality of defendant's conduct from the perspective of a retail investor.  The

4

government will not elicit testimony about Gray's opinion of what other retail investors were thinking, defendant's intent, or the legality of defendant's actions.

- Billy Banks (retail investor) will testify regarding his ownership of CVSI Sciences and Namaste, two securities both targeted by defendant. (Mot., Ex. D.; see also Ex. 2 (Banks 4/28/26 Notes).) Banks will testify to how he saw defendant and defendant's commentary on various television shows and how almost immediately after defendant's commentary on the specific stocks, their price dropped. Banks will further testify to the effect that defendant's comments had on the market, including how he saw them repeated and posted on various message boards and how the price declined almost immediately afterward. Banks will similarly testify to the materiality (to him) of the misleading nature of defendant's statements about Citron's relationship work with hedge funds. Banks would have positioned himself differently – i.e., exited his position – if he knew that defendant and hedge funds were teaming up to short a stock.[3] The government, however, will not seek to elicit other portions of Banks' statements, including his statements speculating on defendant's intent or other goals relating to defendant's activity.

- Doug Anmuth (JP Morgan Stock Analyst) will testify to his coverage of Twitter as a stock analyst. Among other

---

[3] As the Ninth Circuit Model Criminal Instruction 15.47 (Securities Fraud) makes clear: "A fact is material if there is a substantial likelihood that a reasonable investor would consider it important in making the decision to purchase [or] sell securities."

things, he will testify to his firsthand observations of the effect that Citron Research's December 20, 2018 Twitter Report had on the market, in addition to his views on the accuracy of the information in defendant's Twitter report based on his extensive knowledge and experience after having covered Twitter for many years.  Anmuth will provide his opinion, based on his extensive professional knowledge of Twitter, that Citron's report affected the share price on December 20, 2018, and that, had defendant's position and trading been disclosed, the effect of Citron's report on Twitter stock price would not have been the same. (Mot., Ex. F.)  In addition, Anmuth will testify that the sell-off in Twitter's stock that day was so unwarranted that he wrote a responsive note to address defendant's Twitter Report and the sell-off in stock.

- Dan Bachus (CFO of Grand Canyon Education (ticker "LOPE"))[4] will testify to his experience as the CFO of a publicly traded stock that was twice targeted by defendant's short reports.  (Mot., Ex. G.)  He will testify to his direct knowledge of the reaction defendant's reports had, the impact Bachus witnessed on the stock price, and the immediate and numerous communications he had with the company's investors and with analysts and others.  As CFO, part of his duties were determining how GCE would respond

---

[4] Defendant's motion states that Bachus was the CFO of Grand Canyon University.  Bachus is not an officer, employee or agent of Grand Canyon University; he is the CFO of the publicly traded company Grand Canyon Education, traded under stock ticker "LOPE."  The distinction is relevant for purposes of his testimony.

to defendant's reports, and he was closely monitoring investor sentiment and concerns insofar as it pertained to the company's stock price and can offer his lay opinion as to how defendant's conduct impacted investor behavior.  He himself was also a shareholder/investor in GCE and will provide his opinion as to the impact defendant's statements would have had if defendant had disclosed how he was trading.  Backus will not opine on defendant's intent.

All of this testimony is plainly admissible.  Courts have long held that lay opinion testimony is relevant in securities fraud cases, including lay opinion from stock analysts, as it goes to materiality.  See United States v. Ferguson, No. CRIM 3:06CR137 CFD, 2007 WL 4556625, at *3 (D. Conn. Dec. 20, 2007) (permitting analyst testimony explaining how their reports and advice to clients would have been different had they known of the withheld information in securities fraud matter); see also United States v. Schiff, 602 F.3d 152, 172 n.26 (3d Cir. 2010) (finding "[t]he Government has other fact witnesses for materiality, including Wall Street analysts" who would testify that sales and inventory "are material to their investment decisions and forecasts, and were so in this case"); United States v. Hatfield, 724 F. Supp. 2d 321, 325 (E.D.N.Y. 2010) (jury could rationally find that a reasonable investor would consider omitted facts material based on analyst's testimony); United States v. Forbes, Case No. 02-cv-264-AHM, 2006 WL 8423075, *3-4 (D. Conn. Sept. 21, 2006) (allowing analyst to testify how he would have changed his analysis had he known reported financial results were fraudulent); SEC v. Ustian, No. 16-C-3885, 2020 U.S. Dist. LEXIS 14092, *48-54 (N.D. Ill. Jan. 26, 2020) (permitting hypothetical

questions of analysts as to how knowledge of undisclosed information would have affected their views and analysis of the company); see also SEC v. Davis, No. 2:20-CV-03271-SB-KS, 2022 WL 3575769 (C.D. Cal. June 23, 2022).  If stock analysts are routinely permitted to provide such testimony to assist the jury with the issue of materiality, it rationally follows that investors following a company and company executives can also provide such lay testimony, regardless of how they personally traded on defendant's statements on a particular occasion.  All of these witnesses are percipient witnesses to defendant's public statements, can lay foundation for their own perch for how they observed the market, and offer perspectives of what a "reasonable investor" might have considered material.  The government is permitted to provide evidence of this reasonable investor through a composite of different participants. This is how objective standards are proven in trials.

Despite well-established case law that permits this kind of lay opinion testimony in securities fraud cases, see Davis, 2022 WL 3575769, at *3 (collecting cases and holding, in an insider trading case, that analysts testimony as to how nonpublic information "would have changed their reporting" on the company during the relevant period was "proper lay opinion testimony and probative of materiality"), defendant nevertheless seeks to exclude such testimony.  Yet defendant cannot overcome those cases nor Ninth Circuit precedent the permits the very questions on materiality he now challenges.  See United States v. Laurienti, 611 F.3d 530, 549-50 (9th Cir. 2010) (holding that the government may ask its fact witnesses "otherwise relevant questions that may have a guilt-assuming element" to establish materiality such as whether had the

witness known a certain fact if they would have engaged in the same conduct); id. at 549-50 (affirming district court where, "[i]n order to establish materiality of Defendants' actions, the government asked questions such as, "If you had known prior to purchasing [a house stock] that Hampton Porter prevented or discouraged their brokers from allowing their clients to sell their shares of [the house stock], would you have purchased the [shares of the house stock]?"); see also United States v. Cuti, 720 F.3d 453, 458-59 (2d Cir. 2013) ("[A] witness may testify to the fact of what he did not know and how, if he had known that independently established fact, it would have affected his conduct or behavior."); United States v. Jennings, 487 F.3d 564, 581-82 (8th Cir. 2007) (holding that, unlike with respect to character witnesses, it is generally permissible to ask guilt-assuming hypotheticals of fact witnesses to prove materiality); United States v. Kellogg, 510 F.3d 188, 196 (3d Cir. 2007) (holding that "there is nothing inherent in guilt-assuming hypotheticals, in the abstract, that makes them unfairly prejudicial, let alone so prejudicial as to constitute a per se violation of due process").

Defendant's primary argument is that none of these cases apply and such witness testimony is not relevant because the specific witnesses did not trade in the securities at issue based on defendant's recommendations.  But investor reliance is not required for a securities fraud conviction, and the government need not show that a witness traded in or lost money in the stock.  See SEC v. Rana Rsch., Inc., 8 F.3d 1358, 1364 (9th Cir. 1993) (reliance an element of private claim under Rule 10b-5 but not in enforcement or criminal actions brought by government); Ninth Cir. Model Criminal Instructions 15.47 (Securities Fraud) (containing

9

neither reliance nor loss causation as elements of securities fraud). All of the witnesses have personal knowledge of the securities about which they will testify; it does not matter if they did not personally trade in the stock at issue.

Similarly, defendant argues that the government cannot ask such guilt-assuming hypotheticals of investors who never owned the stock, calling such "distinction" "dispositive." (Mot. at 6.) Defendant, however, misunderstands the rule surrounding guilt-assuming questions and Laurienti, 611 F.3d at 549. Laurienti imposed no such purchase-rule as a prerequisite to asking guilt-assuming hypotheticals in securities fraud cases. On the contrary, the Ninth Circuit reaffirmed the proposition that "there appears to be no support for the proposition that the government cannot ask its own fact witnesses otherwise relevant questions that may have a guilt-assuming element" when "plainly relevant and probative." Id. (finding no abuse of discretion in permitting government to ask its own fact witnesses guilt-assuming hypotheticals to establish materiality of defendants' actions). Notably, at least Noonan, Banks, and Bachus did own the stocks in question during the relevant time periods.

Defendant next tries undermine the entire concept of guilt-assuming hypotheticals in general. But his reliance on United States v. Shwayder, 312 F.3d 1109 (9th Cir. 2002), opinion amended on denial of reh'g, 320 F.3d 889 (9th Cir. 2003), is misplaced. There, the Ninth Circuit held it was improper to use "guilt-assuming hypotheticals during cross-examination" of a defendant's **character witnesses.**" Id. at 1120 (emphasis added). That rule has no application here because the government intends to ask such questions of its own fact witnesses. Laurienti, 611 F.3d at 549 ("We have held

10

that guilt-assuming hypotheticals are impermissible in the context of the government's cross-examination of a defendant's <u>character</u> witnesses," citing <u>Shwayder</u>.) (emphasis in original).  Defendant's other claims that the government seeks to insert false premises into any guilt-assuming hypotheticals by asking the jury questions that it must ultimately decide is simply incorrect.  At trial, the government intends to only ask guilt-assuming premises that include uncontested factual premises, such as defendant uncontested trading actions before and after his tweets.  Such questions are plainly permissible.

The government must establish a substantial likelihood that a reasonable investor would consider the matters at issue important in deciding whether to buy or sell securities, and it is entitled to prove its case by evidence of its own choice.  <u>Old Chief v. United States</u>, 519 U.S. 172, 186 (1997).  Here, the government will prove materiality through focused but broad-based testimony from a range of witnesses, including retail investors who followed defendant's public commentary in real time, analysts deeply familiar with the stocks at issue, officers of companies that were the subject of defendant's reports, experts, and, of course, defendant's own admissions.  Each will provide an important perspective that the jury should be permitted to consider and the rules of evidence do not prevent.  The motion should be denied.

**B.    The Government Should be Permitted to Introduce Evidence About the Accuracy of Defendant's Reports and Statements**

Defendant's second argument seeking to preclude the government from introducing evidence that various of defendant's reports were inaccurate fails for several reasons.  As a threshold matter, the FSI charges a scheme that explicitly involved "the perception that

11

[defendant's] analyses were rigorous."  (FSI ¶ 19(e)(iv).)  The credibility and accuracy of those reports is within the plain terms of the FSI.  Despite defendant's suggestion to the contrary, evidence showing these reports were not accurate would constitute neither a variance[5] nor a constructive amendment of the FSI, which discusses with specificity Citron's statements on Cronos, Twitter, and other companies under the header "Defendant LEFT's **Use of Deceptive Reports**."  (FSI at 12 (emphasis added).)

Even had the FSI not directly alleged a scheme dependent on defendant's creating of a perception among investors that his reports were accurate and that his analysis was rigorous, defendant has made clear, repeatedly, that he intends to argue at trial – as a lead defense – that his reports were accurate, thus placing the accuracy of those reports directly at issue.  His motion is a thinly-veiled attempt to distort the trial by permitting defendant to argue that his reports were "accurate," but precluding the government from putting forth evidence to rebut that argument.  Once defendant opens the door by putting the underlying truth and accuracy of the reports at issue, evidence rebutting that argument is relevant and admissible.  Here, it is not even necessary to await opening statements, as defendant's proposed statement of the case shows exactly how he intends to argue.  See ECF No. 333 at 3 (defendant "contends that his published research and commentary were truthful").  Defendant has also flagged his advice of counsel defense and his

---

[5] "A material variance exists if a materially different set of facts from those alleged in the indictment is presented at trial, and if that variance affects the defendant's substantial rights."  United States v. Bhagat, 436 F.3d 1140, 1146 (9th Cir. 2006) (internal quotations omitted).

witness list includes attorney Jack Martel, who stated numerous times that a fundamental assumption of his work was that Citron's reports were issued in good faith and were accurate.  Surely, it cannot be the case that defendant can argue that the reports were truthful while excluding evidence that they were not.[6]

Given the clear allegations in the FSI, the charged scheme, defendant's clear strategy to put the accuracy of the reports at issue, and the plain relevance to proving defendant's intent to defraud, the Court can readily deny the motion.  Evidence that there were factual inaccuracies and unsupported opinions in the Cronos ("CRON"), Twitter ("TWTR"), and Grand Canyon Education ("LOPE") reports published by defendant is admissible and presents no risk of a fatal variance from the FSI.

> 1.    The FSI Charges that the Reports Were False and Misleading

As an initial and dispositive matter, the FSI charges that defendant's reports were false and misleading.  Putting aside the repeated specific allegations that the reports were deceptive, see FSI ¶¶ 23 (CRON), 47 (TWTR), and false and misleading, ¶ 89 (LOPE),[7] the scheme described includes numerous specific allegations that demonstrate the inaccuracies in the reports was part of defendant's scheme:

---

[6] The government raised this issue with defense counsel during the abbreviated meet-and-confer in the hours leading up to defendant filing his present motion late Friday evening, and the defense did not suggest that they intended to argue anything differently.

[7] The specific allegations regarding CRON and TWTR fall under the heading "Defendant LEFT's Use of Deceptive Reports" (FSI at 12); the specific allegations regarding LOPE fall under the heading "Additional False and Misleading Statements and Securities Trading in Furtherance of the Scheme" (FSI at 26).

- "[F]or the scheme to work, defendant LEFT knew that investors needed to believe that the recommendations and positions he set forth were sincerely maintained, and not merely vehicles for defendant LEFT to personally profit."  FSI ¶ 7.

- "To maintain the false pretense that Citron's recommendations and positions were sincerely held, defendant LEFT made false and misleading representations and half-truths about his economic incentives, conviction in Citron's analyses, and valuations of Targeted Securities."  FSI ¶ 7.

- "To maximize the impact of Citron's commentary on the price of the Targeted Security, and thus defendant LEFT's ability to profit from his advance knowledge that a price movement was about to be triggered, defendant LEFT caused Citron's commentary to be deceptive in numerous respects. . .

  o Knowing that Citron's influence on the market was also based in large part on the public's perception that he was confident in the content and conclusions of Citron's commentary, defendant LEFT often included a 'target price' for a Targeted Security which was purportedly derived from his analyses and reflected his sincere projection of the Targeted Security's future price.

  o To enhance the perception that he was confident in the Citron commentary's conclusions and create the perception that his analyses were rigorous, defendant LEFT often included a 'target price' for a Targeted Security which was purportedly derived from his analyses and reflected his sincere projection of the Targeted Security's future price.

14

- o To draw the attention of news-based trading algorithms and to alarm investors, defendant LEFT included sensationalized headlines and inflammatory language in the Citron reports, such as 'fraud' and 'smoking gun.'"  FSI ¶¶ 19(e)(i), (ii) (iv), (v).

- "To buttress the public perception that defendant LEFT was committed to the views expressed in Citron's commentary, regardless of the immediate impact on the price of a Targeted Security, defendant LEFT engaged in media campaigns, appearing in podcast and television interviews and in print and online media, to promote his investment commentary, often including false and misleading statements."  FSI ¶ 19(g).

When properly framed in furtherance of a scheme, there is no fatal variance when evidence of other misrepresentations are offered at trial.  United States v. Begnaud, 783 F.2d 144, 148 (8th Cir. 1986) (finding no fatal variance when the indictment set out two specific representations made in furtherance of a scheme to defraud, and the prosecution offered evidence of, and the jury instruction allowed the jury to consider, other misrepresentations defendants made).

As the FSI makes clear, the scheme involved false statements and deceptive conduct in connection with the reports.  That the recommendations were not based on accurate information and that the content of Citron's reports was not rigorously prepared is explicitly included as part of the scheme.  Defendant's frustration that this evidence undermines his narrative that his reports were accurate does not change the reality of the allegations.  The FSI makes clear that this conduct is within the scheme and charged.  When conduct is

15

alleged in the indictment and proof of the same is offered at trial, there is no variance.  United States v. Sullivan, 522 F.3d 967, 980-81 (9th Cir. 2008) (distinguishing Adamson and finding no variance where government alleged an agreement to misappropriate from two clients and argued at closing that with one client the defendants "hedged their bets" and only misappropriated some of the funds).  As this evidence would be consistent with the allegations in the FSI, defendant's premature claims of variance here are unfounded.  See United States v. Von Stoll, 726 F.2d 584, 586 (9th Cir. 1984) (a variance can only occur when "the evidence offered at trial proves facts materially different from those alleged in the indictment" and finding no variance where the "only inconsistency is that the indictment specified that [the defendant] took the money from one partner, while the proof showed he got it from the other") (citation omitted).  The FSI clearly alleges the existence of the scheme, its object, and its general means, the government is not required to plead every false and misleading statement.  United States v. Giese, 597 F.2d 1170, 1181 (9th Cir. 1979) ("A defendant is not entitled to know all the Evidence the government intends to produce, but only the Theory of the government's case... From the indictment and the government evidence which he did receive, appellant learned enough of the charges against him to prepare for trial, to avoid surprise at trial, and to plead double jeopardy in the event of a new prosecution.") (quoting Yeargain v. United States, 314 F.2d 881, 882 (9th Cir. 1963)); see also United States v. Moyer, 674 F.3d 192, 203-04 (3d Cir. 2012) ("the government did not identify every omission or inclusion that rendered false the documents identified in the indictment").

16

2.    Defendant Has Opened the Door to Evidence of

Inaccuracies in the Reports

Defendant has already asked this Court to tell the jury pool that his defense to this case is that his reports, "research[,] and commentary were truthful."  ECF No. 333 at 3.  Based on the repeated invocations of this argument, see, e.g., ECF No. 250 at 19 (defendant "published original, detailed research that he sincerely believed to be accurate"), no one involved in this case has any doubt that this will be a feature of his defense at trial.  And even if the Court declined to give the specific language included in defendant's self-serving statement of the case, it is a near certainty that defendant will make such a claim in his opening statement once trial commences.

Accordingly, even absent the charged scheme (under which the evidence is already admissible), defendant will promptly open the door to such evidence, mooting the entire premise of his motion.  The Ninth Circuit has rejected attempts to manipulate variance as a strategic sword and shield.[8]  Even if evidence would otherwise be excludable, once the defendant opens the door, the government can put on evidence to respond.  See United States v. Beltran-Rios, 878 F.2d 1208, 1212 (9th Cir. 1989).  Considering these principles, the government must be allowed to meet the defendant's claim that his reports were truthful and issued in good faith.  Defendant has already opened the door, and will undoubtedly swing it wide open at trial; there is no basis to exclude such evidence.  United States v.

---

[8] Among the most factually analogous cases the government found on the compressed briefing schedule is the unpublished opinion United States v. Lo, No. 97-10305, 1998 WL 88369, at *4 (9th Cir. Feb. 11, 1998) (finding no fatal variance where "government's closing argument simply responded to defense testimony").

_Falsia_, 724 F.2d 1339, 1342 (9th Cir. 1983) ("where the defendant opens the door to an argument, it is 'fair advocacy' for the prosecution to enter")).

### 3.   The Evidence is Plainly Relevant

The government charged defendant – among other theories, including the employment of a scheme and the use of deceptive devices – with false and misleading statements in connection with opinions. As the Ninth Circuit found in the wake of _Omnicare_,[9] there are three grounds for opinions to constitute false opinion statements under Rule 10b-5(b): (1) "the speaker did not hold the belief she professed and that the belief is objectively untrue"; (2) "the supporting fact the speaker supplied is untrue"; or (3) "facts going to the basis for the issuer's opinion whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context."  _City of Dearborn Heights v. Align Tech., Inc._, 856 F.3d 605, 615-16 (9th Cir. 2017) (cleaned up) (quoting _Omnicare_, 575 U.S. at 194).[10]  That defendant provided inaccurate and false information about the underlying companies is direct and necessary proof of the actionable opinion statements related to CRON, TWTR, and LOPE.

_First_, that the underlying information is not true can demonstrate both that defendant did not actually hold the underlying opinion and shows that it is objectively untrue.  _Second_, the

---

[9] _Omnicare, Inc. v. Laborers Dist. Council Construction Ind. Pen. Fund_, 575 U.S. 175, 194 (2015).  Of course, Rule 10b-5(b) is only one of the theories the government has alleged against defendant, along with Rule 10b-5(a) (scheme liability) and Rule 10b-5(c) (course of business which operates as fraud or deceit).

[10] In rejecting defendant's motion to dismiss charges based on false opinion statements, the prior district court found that the indictment sufficiently pled those charges.

18

defendant's inclusion of facts that are false or materiality misleading (such as the suggestion that TWTR sold its users' personal data, when it did not) can render the opinion statement false or misleading.  *Third*, the failure to disclose that defendant included untrue facts would undoubtedly undermine the credibility of his opinion to a reasonable person looking at his reports fairly and in context.  For each of these tickers, defendant rendered opinion statements – at the very least through his recommended target prices for each ticker – and therefore the falsity of the underlying reports is simply probative evidence of a viable and charged theory of fraudulent opinion statements in this case.

Moreover, the government charged a scheme.  As the various FSI statements above make clear, the false perception that the reports were in good faith and solidly researched was material to the charged scheme.  This evidence directly shows that the reports were not prepared in such a fashion.  Therefore, even if a specific reference was lacking in the FSI (it is not), this evidence goes directly to defendant's scheme and demonstrates the nature of defendant's goal to inducing investors with the appearance of genuine, quality reports.

Additionally, these statements go to defendant's intent and lack of good faith to rebut defendant's already-stated good faith defense. In any event, as both charged statutes require specific fraudulent intent, the government's affirmative burden requires it to show that defendant did not have good faith.  Accordingly, eliciting testimony as to defendant's use of untrue information in his reports goes directly to intent and lack of good faith, and is not a viable basis for a variance claim.  See United States v. Decker, 624 F. App'x 959, 961 (9th Cir. 2015) (rejecting a material variance claim where

evidence of sexual violence offered to show intent (an element of the crime), not that those acts were *themselves* the criminal act of sexual abuse).

Finally, defendant has convinced the Court to permit him to pursue an advice of counsel defense. (Dkt. 330 at 6-7.) Defendant's witness list includes attorney Martel, who testified repeatedly that his purported advice was based on his understanding that Citron was putting out accurate information in good faith. See, e.g., ECF No. 213-4 at 36 (129:15-23); 56 (214:17-25); 58 (223:14-22). This testimony goes to whether, "before acting, [defendant] made full disclosure of all material facts to an attorney," among other requirements needed to warrant an advice of counsel instruction. Ninth Cir. Model Criminal Instructions 5.10 (Advice of Counsel). Evidence that defendant released inaccurate information in his reports directly refutes that Martel was fully aware of all material facts, and is necessary to meet the advice of counsel defense defendant is advancing. Defendant's failure to establish the predicate steps for an advice of counsel defense would make it improper to instruct the jury on this defense. See United States v. Bush, 626 F.3d 527, 539 (9th Cir. 2010) (a defendant's failure to meet any of the predicates renders an advice of counsel instruction inappropriate). Again, the defense is putting the accuracy of the reports at issue and trying to prevent the government from responding. The Court should reject this improper request.

### 4.    There is No Risk of a Fatal Variance

Defendant largely relies on Adamson, where a fatal variance occurred after the government presented evidence of a different misrepresentation than the one included in the indictment and the

20

district court gave an instruction that allowed a conviction based on that different misrepresentation.  291 F.3d 606, 616 (9th Cir. 2022).  There is nothing comparable here.  Nothing about the FSI "induced the defendant to prepare a defense that could not adequately respond to the government's case."  United States v. Eddings, No. 2:09-CR-00074 JAM, 2011 WL 5838231, at *3 (E.D. Cal. Nov. 21, 2011).  Instead, defendant has chosen to defend this case by asserting the accuracy of the underlying reports.  But defendant's narrative is severely undercut by the evidence.  Just as impeachment evidence or evidence offered for another permissible purpose cannot form the basis for variance, evidence introduced to undermine a central defense should not offer a basis for claiming variance.  Bhagat, 436 F.3d at 1146 (citing United States v. Kahan & Lessin Co., 695 F.2d 1122, 1125 (9th Cir. 1982) ("We have previously held that evidence not referenced in the indictment may be admitted for 'impeachment or other legitimate purposes,' without effecting any changes to the indictment.")).

Moreover, Adamson involved a very different posture and provides limited value here in the pre-trial motion in limine context.  In Adamson, the Court found no constructive amendment of the indictment and only found a fatal variance only after the government proceeded on the varied misrepresentation and the court instructed on the unalleged misrepresentation.  291 F.3d at 615-16.  There is no risk of that occurring here.  The Ninth Circuit has noted that the issue in Adamson arose because "the jury was steered toward a finding at variance with the indictment[,]" Bhagat, 436 F.3d at 1147, and at this pre-trial posture both the government and Court can ensure that does not occur.

As an initial matter, the government is proceeding on the theory it always has: the defendant engaged in a deceptive scheme and utilized deceptive devices in the form of his tweets and reports to manipulate the market to profit on the artificial price movements he caused.  He utilized false and misleading tweets and reports to advance this scheme.  To the extent the government is alleging specific false statements, misleading statements and half-truths constitute the crime: they relate to defendant's purported positions, trading intent, target prices, views on the companies, and other aspects of his "skin in the game" in the various securities.  It is a scalping theory.  But, of course, as defendant recently briefed in one of his motion in limine oppositions, false information about an underlying company can be and, is here, in furtherance of the scheme.[11]

Defendant continues to put the accuracy and veracity of the underlying information at issue.  Defendant also continues to want it both ways: he wants to argue the information was accurate, but prevent the government from putting on evidence that it was not; he wants to argue that Zweig requires more than just misleading information about trading intention, while seeking to prevent the jury from hearing such information.  The Court should reject this double standard.

---

[11] See ECF No. 249 at 13-14 (discussing Zweig v. Hearst Corp., 594 F.2d 1261, 1264-65 (9th Cir. 1979) and conceding that the commentator "did not know that the misleading parts of his column were false" but attempting to distinguish defendant's conduct as not based on inaccurate and unverified information; see also id. at 14 ("The omission about the commentator's stock holdings in Zweig, therefore, was significant only for the effect it had on the public's reliance on the underlying commentary, which the Court had already decided was 'misleading' and 'false.'").

### 5.    There is No Prejudice

Finally, any purported variance would not be fatal and there can be no prejudice.  Defendant has been on notice since at least February 2025 that Gorenstein would present evidence that the statements in the CRON report were factually inaccurate.  See Ex. 3. Defendant has known since the original FBI 302 for Anmuth was produced in January 2026 that he would testify that Twitter did not sell its users' personal information.  See Ex. 4.  Defendant's motion did not attach those interview reports.  Instead, the defense feigns that it had no knowledge before its motions in limine were due that the government had evidence it intended to present at trial that the reports were inaccurate, and relied on that purported procedural posture to justify this last ditch motion to exclude relevant evidence.  The Court should not entertain it.

Defendant then tries to turn his failed Bill of Particulars motion into a weapon to exclude patently relevant evidence.  As an initial matter, the government's theory of fraud has not changed and its Bill of Particulars opposition brief did not commit the government to introducing no evidence of the reports' inaccuracies at trial.  As the opposition noted though, there was a thorough speaking indictment (which, as discussed above, highlighted the role of the reports' inaccuracies), ECF No. 101 at 11, and searchable, well-organized discovery, id. at 13, 18-21.  See United States v. Ryan, 283 F. App'x 479, 482 (9th Cir. 2008) (no variance where defense has notice that testimony related a topic would be introduced and "it is not distinctly different from the allegations set forth in the indictment[,]"); United States v. Sandoval, No. CR 22-1010 JB, 2024 WL 278786, at *43 n.23 (D.N.M. Jan. 25, 2024), aff'd, 154 F.4th 741

(10th Cir. 2025) (no variance where indictment properly alleged statutory elements and defendant was able to review relevant interview in discovery and knew of its contents).  Defendant cannot be prejudiced when there is no change in the government's theory, he affirmatively inserted the accuracy of the underlying reports as a disputed issue at trial, and he had full notice that this evidence was part of the scheme, would negate good faith, and prove intent.[12] Lo, 1998 WL 88369, at *4 (rejecting fatal variance claim where "the focus of the government's case remained consistent with the charges in the indictment[,] the government offered no evidence that suggested an alternative theory of guilt[,]" and, after reviewing the closing, concluding "the government did not, as [the defendant] has suggested, offer a theory of guilt" that differed from the indictment").

In addition, the inaccurate information about the underlying companies is in furtherance of defendant's scheme, not its gravamen.

---

[12] Defendant incorrectly cites the Ninth Circuit's opinion in Lincoln v. Sunn, which discussed circumstances that "might" constitute prejudicial variance.  807 F.2d 805, 813 (9th Cir. 1987). The Court there did not find that the purported late notice by the government there constituted a fatal variance and remanded to the district court to address with the peculiar facts (the indictment charged the non-existent crime of "murder for hire" but listed the elements of "murder").  Id. at 811-14 (collecting cases where there was adequate notice even with a variance).  Here, even if the government was introducing a new theory (it is not), it would be the same offense charged: securities fraud, and would not alter the case that defendant did not have a fair opportunity to defend.  Id. at 813.  Notably, since at least July 2025, when current counsel began authoring defendant's briefs and shaping the defense, it has been clear that defendant wanted to make the accuracy of his reports a defense at trial.  ECF No. 60 at 2 ("Instead, Left is being prosecuted for injecting accurate opinions into the market, and then allegedly failing to invest in concert with the opinions he expressed.").  That there is evidence undermining this defense – evidence that is part and parcel of the charged scheme – does not render the evidence inadmissible.

Defendant's suggestion that the percipient, non-opinion testimony from three witnesses with the obvious foundation to testify as to these topics does not alter the analysis.  The executives of the companies, Gorenstein and Bachus, were at these companies – and victimized by defendant's fraud – when defendant made his false reports.  They can surely testify as to why the allegations against them were not meritorious and hurt each of their respective companies and investor bases.  Anmuth, the analyst, is a prototypical fact witness.  See Ferguson, 2007 WL 4556625, at *3; Schiff, 602 F.3d at 172 n.26.  He, like defendant, analyzed Twitter and published reports about it.  Unlike defendant, Anmuth studied the company for years to have a deep understanding of its business and operations to issue factual information about it (as opposed to calling it the "Harvey Weinstein" of social media).[13]  He will be able to lay the proper foundation that, from his direct knowledge of TWTR's business, the claims in defendant's report were not true.  He will refute defendant's comparison of TWTR to Harvey Weinstein and will confirm that the company did not sell its users' personal data.  This testimony is squarely in the realm of what defendant was made aware of and should have expected based on the allegations in the FSI, the discovery, and in response to his own assertions that the accuracy of his reports should be a question at this trial.

**III.  CONCLUSION**

For the foregoing reasons, the government respectfully requests that this Court deny defendant's motion.

---

[13] This false and misleading statement is alleged in the FSI. See ¶ 47 (alleging a deceptive TWTR report accusing the company of being the "Harvey Weinstein of social media").

Dated: May 5, 2026                          Respectfully submitted,

                                            TODD BLANCHE
                                            Acting Attorney General
                                            BILAL A. ESSAYLI
                                            First Assistant United States
                                            Attorney

                                            JENNIFER L. WAIER
                                            Chief Assistant United States
                                            Attorney
                                            Chief, Criminal Division


                                                   /s/
                                            BENEDETTO L. BALDING
                                            ANDREW M. ROACH
                                            MATTHEW REILLY
                                            Assistant United States Attorneys

                                            Attorneys for Plaintiff
                                            UNITED STATES OF AMERICA

26

<u>Certificate of Compliance</u>

The undersigned, counsel of record for the United States, certifies that this brief complies with the word limit of L.R. 11-6.1.


Dated: May 5, 2026                    Respectfully submitted,

                                      TODD BLANCHE
                                      Acting Attorney General
                                      BILAL A. ESSAYLI
                                      First Assistant United States
                                      Attorney

                                      JENNIFER L. WAIER
                                      Chief Assistant United States
                                      Attorney
                                      Chief, Criminal Division


                                      _____/s/_____
                                      BENEDETTO L. BALDING
                                      ANDREW M. ROACH
                                      MATTHEW REILLY
                                      Assistant United States Attorneys

                                      Attorneys for Plaintiff
                                      UNITED STATES OF AMERICA