TODD BLANCHE
Attorney General
BILAL A. ESSAYLI
First Assistant United States Attorney
JENNIFER L. WAIER
Chief Assistant United States Attorney
Chief, Criminal Division
ANDREW M. ROACH (Cal. Bar No. 293375)
Assistant United States Attorney
Major Frauds Section
LORINDA I. LARYEA
Chief
Criminal Division
White Collar and Corporate Enforcement Section
MATTHEW REILLY
Criminal Division
White Collar and Corporate Enforcement Section
1100 United States Courthouse
312 North Spring Street
Los Angeles, California 90012
Telephone: (213) 894-0306
E-mail: andrew.roach@usdoj.gov
matthew.reilly2@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ANDREW LEFT,<br><br>Defendant. | No. 2:24-CR-000456-VAP<br><br><u>GOVERNMENT'S BRIEF IN SUPPORT OF ITS PROPOSED U.S.S.G. LOSS AMOUNT</u> |

Plaintiff United States of America, by and through its counsel of record, the Attorney General, the First Assistant United States Attorney for the Central District of California, and Assistant United States Attorney Andrew M. Roach, and Matthew Reilly, hereby files this Brief in Support of the Government's Proposed United States Sentencing Guidelines Loss Amount.

The government's brief is based upon the attached memorandum of points and authorities, the trial record, other files and records in this case, the attached declarations of Dr. Matthew Cain and Ross Waller, and such further evidence and argument as the Court may permit.

Dated: October 6, 2026

Respectfully submitted,

TODD BLANCHE
Attorney General

BILAL A. ESSAYLI
First Assistant
United States Attorney

JENNIFER L. WAIER
Chief Assistant United States Attorney
Chief, Criminal Division

LORINDA I. LARYEA
Chief, White Collar and Corporate
Enforcement Section
Criminal Division

/s/
MATTHEW REILLY
ANDREW M. ROACH

Attorneys for Plaintiff
UNITED STATES OF AMERICA

## TABLE OF CONTENTS

DESCRIPTION PAGE

MEMORANDUM OF POINTS AND AUTHORITIES....................................1

I. INTRODUCTION.........................................................1

II. LEGAL STANDARDS.....................................................3

III. LOSS GUIDELINE ANALYSIS............................................4

A. Defendant's Market Manipulation Caused a Loss.............5

B. Loss Cannot Reasonably Be Determined......................6

C. Defendant's Gain Was $17.24 Million.......................11

IV. CONCLUSION..........................................................14

# Table of Authorities

## CASES

United States v. Abouammo, No. 22-10348, 2024 WL 4972564 (9th Cir. Dec. 4, 2024) .......... 3

United States v. Armstead, 552 F.3d 769 (9th Cir. 2008) .......... 4, 10

United States v. Barama, No. 23-2087, 2025 WL 303086 (9th Cir. Jan. 27, 2025) .......... 5

United States v. Berger, 587 F.3d 1038 (9th Cir. 2009) .......... 12-13

United States v. Hicks, 217 F.3d 1038 (9th Cir. 2000) .......... 13

United States v. Jenkins, 633 F.3d 788 (9th Cir. 2011) .......... 4

United States v. Lopez, No. 2:23-CR-00055-CDS-MDC, 2025 WL 3094046 (D. Nev. Nov. 5, 2025) .......... 9

United States v. Martin, 796 F.3d 1101 (9th Cir. 2015) .......... 9

United States v. Tzolov, 435 F. App'x 15 (2d Cir. 2011) .......... 9

United States v. Yafa, 136 F.4th 1194 (9th Cir. 2025) .......... 3, 9

United States v. Zolp, 479 F.3d 715 (9th Cir. 2007) .......... 3

## STATUTES

15 U.S.C. § 78ff .......... 1

15 U.S.C. § 78j(b) .......... 1

18 U.S.C. § 1348 .......... 1

18 U.S.C. § 3663A (c)(3)(B) .......... 6

## OTHER AUTHORITIES

17 C.F.R. § 240.10b-5 .......... 1

## U.S. SENTENCING GUIDELINES

U.S.S.G. § 2B1.1 .......... passim

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I. INTRODUCTION

At trial, the jury convicted defendant Andrew Left for 15 executions of the securities fraud scheme in Count One, 18 U.S.C. § 1348, and 12 substantive counts of securities fraud, 15 U.S.C. §§ 78j(b), 78ff and 17 C.F.R. § 240.10b-5. Defendant was convicted of a scheme to manipulate the prices of securities through a series of false and misleading statements, half-truths, and deceptive devices - namely his tweets and public statements that were used to generate short term price distortions in the market - in order to engage in profitable short-term trading around the securities that he targeted. He executed the scheme in the long and the short direction. He leveraged his false and misleading message by amplifying it throughout the media. And, in many cases, he placed pre-tweet limit orders and utilized short-dated options that were designed to capitalize on the very volatility that he injected into the marketplace. Defendant then released his statements into the market — through his well-timed and sensational tweets — and quickly exited all or nearly all of his pre-tweet positions shortly after his statements artificially inflated or deflated the market. The scheme was impactful and profitable. He made millions. The evidence at trial showed that defendant's statements had meaningful, short-term price impact and altered the total mix of information in the relevant markets. The evidence also showed that defendant aggressively traded around his public statements to generate enormous profits.

At sentencing, defendant's loss amount under U.S. Sentencing Guidelines (U.S.S.G.) § 2B1.1 should be based on his gains. As his

gains were greater than $15,000,000,[1] this should result in a 20-level increase to his guidelines. While loss and not gain is generally the default metric for calculating a securities fraud defendant's guidelines under § 2B1.1, when - as here — the loss cannot reasonably be determined, the "court shall use the gain that resulted from the offense as an alternative measure[.]" U.S.S.G. § 2B1.1(b)(1), Notes to Table (B). In this brief and the attached declarations, the government establishes the evidence supporting the use of gain as the appropriate measure under the Guidelines. First, through the declaration of Dr. Matthew Cain, the government demonstrates both that there was in fact a loss from defendant's scheme conduct, but that it cannot be reasonably determined under the facts and circumstances of this case. Second, through the declaration of Ross Waller, the government offers a highly conservative measure of defendant's gain. The resulting number is less than the amount proven at trial by further reducing defendant's profits by applying numerous limitations. The proposed gain metric only uses the market moving windows proven at trial, discounts price fluctuations that can be attributed to market-wide or sector-wide changes, and uses "mark to market" pricing to ensure that the gain cannot be attributed to any pre- or post-window price movements. Using these limitations and only the counts and executions for which the jury found defendant guilty, defendant's gains for purposes of the Guidelines were $17,240,768.

[1] At sentencing, the government anticipates that the November 2026 guideline amendments will have gone into effect, which includes changes to the § 2B1.1 loss table.

## II. LEGAL STANDARDS

A district court "need not make its loss calculation with absolute precision; rather, it need only make a reasonable estimate of the loss based on the available information." United States v. Zolp, 479 F.3d 715, 719 (9th Cir. 2007). "The guidelines do not present a single universal method for loss calculation under § 2B1.1—nor could they, given the fact-intensive and individualized nature of the inquiry." Id. at 718. When seeking an upward adjustment, such as that under § 2B1.1, the government bears the burden. Id.

Historically, the U.S.S.G.'s instruction on when gain was an appropriate alternative measure for loss was based on a comment to the Guidelines. See former U.S.S.G. § 2B1.1, cmt. n. 3(C). However, in the November 2024 adjustments to the Guidelines, this commentary was moved into the authoritative the Guidelines' text. See United States v. Abouammo, No. 22-10348, 2024 WL 4972564, at *1 (9th Cir. Dec. 4, 2024). As a result, there is limited Ninth Circuit caselaw on the application of this rule as a guideline and not merely commentary. However, even when based on the comments, the Ninth Circuit approved of using gain as an alternative measure of loss when gain could not be reasonably determined. See United States v. Yafa, 136 F.4th 1194, 1198–99 (9th Cir. 2025) (affirming the use of gain in a "pump-and-dump" stock manipulation scheme case and reiterating that "relying on the amount of gain enables courts to 'maintain[ ] sufficient flexibility' and issue sentences that 'avoid[ ] unwarranted sentencing disparities among defendants ... who have been found guilty of similar criminal conduct,' even where the actual loss resulting from a defendant's conduct is difficult to calculate").

In application, the test is straightforward. The relevant statutes point to § 2B1.1. See U.S.S.G. Appendix A. Under § 2B1.1, if the loss is greater than $6,500, a table is utilized to add offense levels. § 2B1.1(b)(1). In the "Notes to Table," a sentencing court is instructed that it "shall use the gain that resulted from the offense as an alternative measure of loss only if there is a loss but it reasonably cannot be determined." § 2B1.1(b)(1)(B). Therefore, to utilize gain, the sentencing court must first determine that there was a loss. Then, it must evaluate whether or not that loss can reasonably be determined. And, finally, it must determine the gain resulting from the offense. The Ninth Circuit has approved a district court's use of "ill-gotten gains" as a permissible "method of calculating loss" under USSG § 2B1.1 for a defendant convicted of securities fraud under Title 15 for a "pump and dump" scheme. United States v. Jenkins, 633 F.3d 788, 808-09 (9th Cir. 2011) (affirming the district court where it "believed that the evidence of ill-gotten gains was 'so clear and convincing' that it chose to adopt that measure of loss over the 'more controversial and disputable' amount based on stock prices.") It has similarly affirmed the "use of gain as a proxy for a portion of the total loss where some, but not all, of the loss can be determined." United States v. Armstead, 552 F.3d 769, 778 (9th Cir. 2008).

**III. LOSS GUIDELINE ANALYSIS**

An application of the principles of U.S.S.G. § 2B1.1 results in a clear result on the offense levels to be added to defendant's sentencing guidelines. First, Dr. Cain's declaration establishes as a matter of "mathematical and economic certainty" that defendant's trading profits created losses for counterparties. Ex. A,

Declaration of Dr. Matthew Cain ("Cain Decl.") ¶ 2(b). Second, Dr. Cain concludes that while losses occurred, "they cannot be reasonably determined" and that "it is straightforward to measure the trading profits, or gains, realized by the defendant in relation to the Charged Statements and related trading activity in the subject securities." Id. ¶2(c)-(d). Next, Mr. Waller's declaration provides a number of constraints applied to the profit figures from trial to reflect the most narrow interpretation of defendant's manipulative trading activity and discounts for any external market factors that may have mitigated price impact. See generally Ex. B., Declaration of Ross Waller ("Waller Decl."). Lastly, the application of these principles to defendant's trading records results in gains to defendant of $17,240,768. Accordingly, 20 offense levels should be added to defendant's sentence under § 2B1.1(b)(1)(K).

**A. Defendant's Market Manipulation Caused a Loss**

The Guidelines first require a finding that there was a loss before turning to whether utilizing gain is appropriate. Cf. United States v. Barama, No. 23-2087, 2025 WL 303086, at *3 (9th Cir. Jan. 27, 2025) (requiring that a district court first make a finding that there was victim loss). Dr. Cain established at trial through his economic analysis and event studies that defendant's conduct – his statements and trading – altered the total mix of information and had statistically significant price impact. Cain Decl. ¶ 11. In other words, defendant's conduct caused price inflation and deflation. Id. "These temporal price distortions in the subject securities allowed the defendant to generate trading profits at the expense of other market participants." Id. ¶ 13 ("Many investors who purchased the subject securities at inflated prices or sold the subject securities

at deflated prices experienced losses. Investor losses in the subject securities represent a wealth transfer from those investors to the defendant through his trading profits, or gains.”). Because defendant’s conduct caused losses to either direct counterparties or other downstream market participants, there is a sufficient basis to conclude that the threshold loss element has been established. Id. ¶ 16.

**B. Loss Cannot Reasonably Be Determined**

Loss cannot reasonably be determined in this matter for a number of theoretical and practical reasons. Cain Decl. ¶ 2(c) (“the precise quantification of losses caused by the defendant’s Charged Statements and related trading in the subject securities cannot be reasonably determined”). In analyzing the facts and circumstances of this case, it is significant that defendant’s manipulative scheme included over 15 different executions of the scheme, including both misstatements and deceptive trading. The price distortions often lasted for discrete intraday periods. Accordingly, analyzing loss would introduce complexities and complications that would make it unreasonable to determine it for sentencing. Compare 18 U.S.C. § 3663A(c)(3)(B) (finding in the related restitution context that restitution need not be imposed where the determination of “complex issues of fact related to the cause or amount of the victim’s losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process”). Dr. Cain attributed this to the “labor-intensive, error-prone, and potentially impossible exercise to identify the actual losses suffered by each individual investor who transacted with the defendant.” Cain Decl. ¶ 2(c). Dr. Cain also

highlighted that imperfect trading records, offsetting and hedging activities by other investors, and the lack of a claims administrator all add to the inability to reasonably determine loss in this case. Id. ¶¶ 2(c), 18 (discussing the differences in a civil securities class action and the claims administration process implemented there, which does not exist in this case). In this case, with 15 executions that defendant was found guilty of, specified time and date windows, and extensive options trading, there are hundreds of securities in question and likely millions of trades. Id. ¶ 19.[2] Without the necessary individual investor records or an ability to determine the investors' cost basis, and considering the complex trading volume patterns in the underlying securities, it "would be particularly complex" and "[a]s a result, this approach to measuring investor losses is not reasonably practicable in this matter." Cain Decl. ¶ 19.

While the commentary to § 2B1.1 outlines one method "the court may consider" for calculating loss when there is fraudulent inflation or deflation in the value of securities (known as the Modified Rescissory Method ("MRM")), Application Note 3(E)(ix),[3] the MRM has

---

[2] Dr. Cain's "analyses documented that hundreds of millions of shares across all of the subject securities traded hands during the windows of price distortions caused by defendant's Charged Statements and trading. This indicates that such calculations would involve trading records for myriad unidentified victims." Cain Decl. ¶ 18.

[3] §2B1.1 Application Note 3(E)(ix):

> (ix) Fraudulent Inflation or Deflation in Value of Securities or Commodities.— In a case involving the fraudulent inflation or deflation in the value of a publicly traded security or commodity, the court in determining loss may use any method that is appropriate and practicable under the circumstances. One such method the court may consider is a method under which the

*(footnote cont'd on next page)*

little applicability to the facts of this case where defendant was found guilty for his statements on and trading in multiple securities for relatively brief time windows. For trial, Dr. Cain had to conduct more than a dozen event studies just to determine if there was a market impact due to defendant's conduct. Conducting even further analysis to determine the extent of the impact per individual victim was never done and would be extremely complex for the reasons mentioned. Moreover, given that the conduct was a single financial commentator introducing misleading information into the market via Twitter and the internet about a range of companies, as opposed to a corporate announcement on a singular company, and largely without corrective disclosures, the MRM lends little value to this case. See Cain Decl. ¶ 21. The MRM would also overwhelmingly include price movements outside of the price impact windows, which is "untethered from the intraday price impact caused by the Charged Statements" that were the focus of the scheme and the evidence at trial. Id. ¶ 21.

---

actual loss attributable to the change in value of the security or commodity is the amount determined by—

(I) calculating the difference between the average price of the security or commodity during the period that the fraud occurred and the average price of the security or commodity during the 90-day period after the fraud was disclosed to the market, and

(II) multiplying the difference in average price by the number of shares outstanding.

In determining whether the amount so determined is a reasonable estimate of the actual loss attributable to the change in value of the security or commodity, the court may consider, among other factors, the extent to which the amount so determined includes significant changes in value not resulting from the offense (e.g., changes caused by external market forces, such as changed economic circumstances, changed investor expectations, and new industry-specific or firm-specific facts, conditions, or events).

This finding also comports with the case law. In Yafa, the Ninth Circuit affirmed the use of gain in a pump-and-dump scheme after the district court determined that the "full amount of investor losses would be exceedingly difficult to calculate," and therefore "gain as a proxy for a portion of the total loss" was most appropriate for measuring the impact of the defendant's criminal activities. Yafa, 136 F.4th at 1197 (affirming use of gain in securities fraud sentencing). Courts have similarly found that "[i]f it is not feasible to determine the actual or intended loss, district courts may use the defendant's gain as another way to measure the loss." United States v. Martin, 796 F.3d 1101, 1111 (9th Cir. 2015); United States v. Lopez, No. 2:23-CR-00055-CDS-MDC, 2025 WL 3094046, at *4 (D. Nev. Nov. 5, 2025) (discussing loss in a case based on a material omission in a business transaction and utilizing gain "[b]ecause the loss is almost impossible to calculate"); see also United States v. Tzolov, 435 F. App'x 15, 17 (2d Cir. 2011) (affirming district court's sentence in securities fraud matter where defendant "inflicted pecuniary loss on his victims, but that the amount of loss could not reasonably be determined").

Also, while this is not an insider trading case, the background principle to that guideline (which foregoes the question of loss and starts with gain) is instructive here:

> Insider trading is treated essentially as a sophisticated fraud. Because the victims and their **losses are difficult if not impossible to identify**, the gain, i.e., the total increase in value realized through trading in securities by the defendant and persons acting in concert with the defendant or to whom the defendant provided inside information, is employed instead of the victims' losses.

§ 2B1.4 Background (emphasis added). This too was a sophisticated fraud and concerns the conduct of an individual trader in the broader market as opposed to the lasting impact of a corporate misstatement (as contemplated in the MRM). For the same reasons that losses are difficult if not impossible to identify from the individual trading of an insider trading defendant and gain is a better measure, the Court should find that the losses from defendant's conduct are not reasonably determinable and instead look to gain from defendant's own trading around his market-moving statements.

This is especially appropriate where "defendant's gain represents a reasonable and reliable measure of investor losses caused by the Charged Statements and defendant's related trading activity in the subject securities." Cain Decl. ¶ 22. In Armstead, 552 F.3d at 778, the Ninth Circuit approved the use of gain as a proxy for a portion of the total loss where some, but not all, of the loss could be determined. And here, defendant's "trading profits attributable to the price movements caused by his statements and trading activity provide an economically grounded proxy for investor harm." Cain Decl. ¶ 23. This is because the same "distortion that generated defendant's gain disadvantaged the other investors who traded with him, allowing him to purchase securities at artificially deflated prices or sell securities at artificially inflated prices" and "reflects wealth transferred from other market participants through the alleged misconduct." Id. ¶ 23. Finally, Dr. Cain supports the proposed gain methodology for its close analog to the likely realized losses, the comparative certainty of defendant's own trading records, and the use of this methodology in SEC enforcement matters. Id. ¶¶ 24-26.

**C. Defendant's Gain Was $17.24 Million**

Defendant's gain was calculated by the government's trading expert at trial, Mr. Waller. Mr. Waller applied a series of additional limitations from the raw profit numbers offered at trial to provide a conservative measure of the profits for the 15 securities where the jury found defendant executed his scheme. The notable restrictions that Mr. Waller added were:

1. He limited his analysis to profits achieved during the price impact measurement windows identified by Dr. Cain. See Waller Decl. ¶ 4.

2. When trades occurred outside the window, Mr. Waller "marked-to-market" with prices corresponding to the beginning or end of the window. Id. ¶ 6. This minimized the risk that prior or subsequent market factors (i.e., those outside of the window where defendant's tweet influenced the market) could be responsible for profits.

3. The calculation subtracts trading commissions, fees, and an estimate of borrowing costs (if applicable) in a manner favorable to the defendant. Id. ¶ 8.

4. The methodology then reduces the price of the return on each stock based on Dr. Cain's analysis of either market or sector-wide movements for that time period. Id. ¶ 9.

Utilizing these factors, Mr. Waller calculated defendant's temporal, price, and market or sector adjusted profits to reach the following assessment:

//

//

//

//

//

//

//

| | Date | Start Time | End time | Position (Share Exposure) | Cain-Adjusted Profit |
|---|---|---|---|---|---|
| | | | | | |
| **CRON** | 8/30/2018 | 9:20 AM | 7:50 PM | (943,900) | **$ 831,402** |
| **PTE** | 10/18/2018 | 9:50 AM | 10:50 AM | (247,671) | **$ 204,304** |
| **TSLA** | 10/23/2018 | 9:20 AM | 7:50 PM | 333,100 | **$ 5,023,552** |
| **NVDA** | 11/20/2018 | 9:20 AM | 11:00 AM | 140,800 | **$ 1,010,702** |
| **TWTR** | 12/20/2018 | 8:10 AM | 12:10 PM | (1,362,000) | **$ 1,602,062** |
| **FB** | 12/26/2018 | 7:30 AM | 4:00 PM | 370,000 | **$ 137,607** |
| **ROKU** | 1/8/2019 | 9:00 AM | 10:40 AM | (250,000) | **$ 678,080** |
| **CHGG** | 3/22/2019 | 8:20 AM | 1:50 PM | (390,000) | **$ 591,978** |
| **FLT** | 6/6/2019 | 10:20 AM | 10:50 AM | (259,000) | **$ 621,352** |
| **NVTA** | 7/31/2019 | 9:40 AM | 10:50 AM | 430,000 | **$ 251,846** |
| **LOPE** | 1/28/2020 | 10:40 AM | 1:10 PM | (289,000) | **$ 2,186,011** |
| **NVAX** | 4/20/2020 | 12:10 PM | 3:10 PM | (315,695) | **$ 336,334** |
| **AAL** | 6/5/2020 | 10:50 AM | 3:30 PM | (1,000,000) | **$ 204,495** |
| **PLTR** | 11/27/2020 | 8:40 AM | 11:40 AM | (415,000) | **$ 1,295,968** |
| **XL** | 12/23/2020 | 11:10 AM | 2:30 PM | 445,000 | **$ 2,265,075** |
| | | | | | |
| **TOTAL** | | | | | **$ 17,240,768** |

Waller Decl. ¶ 10. Accordingly, defendant's gain is $17.24 million and 20 offense levels should be added to his guidelines.

This approach is well-supported by and goes beyond the requirements of Ninth Circuit precedent. In United States v. Berger, 587 F.3d 1038, 1042-44 (9th Cir. 2009), the Ninth Circuit explicitly rejected a strict, civil loss causation standard for criminal sentencing. Instead, the Ninth Circuit articulated the guiding principles for this circuit in securities fraud sentencings:

> In criminal sentencing, however, a court gauges the amount of loss *caused*, i.e., the harm that society as a whole suffered from the defendant's fraud. Whether and to what extent *a particular individual* suffered actual loss is not usually an important consideration in criminal fraud sentencing. Therefore, where the value of securities have been inflated by a defendant's fraud, the defendant may have caused aggregate loss

> to society in the amount of the fraud-induced overvaluation, even if various individual victims' respective losses cannot be precisely determined or linked to the fraud.

Id. 1044 (internal citation omitted) ("the principle underlying the Dura Pharmaceuticals Court's reluctance to allow mere overvaluation as a basis for establishing loss is generally not present in the criminal sentencing context, and we are not persuaded that it would be appropriate to expand the Dura Pharmaceuticals rule to the criminal sentencing context"). Ultimately, the Ninth Circuit "reiterate[d] our broader rule that [t]he Guidelines' relevant conduct provision requires a defendant's sentence to be based on all harm that resulted from the acts or omissions' of the defendant." Id. at 1045 (quoting United States v. Hicks, 217 F.3d 1038, 1048 (9th Cir. 2000)). Moreover, the government's proposed methodology aligns with § 2B1.1's commentary noting that the court "may consider" "the extent to which the amount so determined includes significant changes in value not resulting from the offense (e.g., changes caused by external market forces, such as changed economic circumstances, changed investor expectations, and new industry-specific or firm-specific facts, conditions, or events." Application Note 3(E)(ix). Because Mr. Waller utilized Dr. Cain's windows and modified profits to reflect only the event study adjusted price inflation or deflation in the relevant securities, the resulting gains are limited to the most narrow time frame for price impact and restricted by any change in the stock price attributable to other market forces. Ultimately, the government's restrained approach to calculating defendant's gain from the securities of conviction provides an appropriate alternative

measure of the loss caused by defendant's conduct, making it a well-suited proxy for defendant's guidelines calculation.

## IV. CONCLUSION

For the foregoing reasons, the Court should find that, for sentencing purposes, the defendant's gain was $17.24 million and defendant's guidelines should be increased by 20 offense levels under U.S.S.G. § 2B1.1(b)(1)(K).

CERTIFICATE OF COMPLIANCE

The undersigned, counsel for the United States, certifies this memorandum of points and authorities complies with the word limit of L.R. 11-6.1.

Dated: October 6, 2026

/s/

MATTHEW REILLY